WHITTENTON MANUFACTURING COMPANY vs. HERBERT M. STAPLES.

Bristol.    October 23, 1894. — October 4, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Deed — Mill — Easement — Prescription — Equity.*

If the construction of a deed is doubtful, the practical construction put upon it by the parties and their successors may be looked at in connection with the deed itself and the circumstances existing at the time of its execution.

A deed to A. of a mill site, for the use of which and four others on the same stream the grantor had built a reservoir dam, conveyed "all and singular the rights, privileges, easements, and appurtenances to the said land in any wise belonging or appertaining, and all the streams, dam, water power and privileges, and head and fall of water," with all "the rights, privileges, easements, and appurtenances thereto belonging, and which have been or of right can be used or enjoyed therewith"; and also provided that A. and his assigns should pay to the grantor and his assigns one fifth of the flowage damages caused by the reservoir dam. B. acquired the mill site by mesne conveyances, the deed to him conveying "all rights of flowage appurtenant to said estate." All parties in interest, after the deed to A., treated the reservoir as existing for the common benefit of all the mill privileges. *Held*, that a right to have the use and benefit of the reservoir was included in the deed to A., and that such right descended to B.

A stipulation in the deed of a mill site, for the use of which and four others on the same stream the grantor had built a reservoir dam, that the grantee and his assigns shall pay one fifth of the flowage damages caused by the dam, imposes an obligation in the nature of an easement or servitude upon the estate, which may be enforced in equity, though not as a personal obligation, against a subsequent grantee, and a servitude may also be imposed on the land by prescription for one fifth of the cost of repairing the dam and one fifth of the compensation for drawing the water from the reservoir, which may be enforced in like manner. FIELD, C. J., HOLMES & LATHROP, JJ., dissenting.

BILL IN EQUITY, filed in the Superior Court on February 15, 1894, by the owner of a mill on Mill River in Taunton, against another mill-owner on the same river, to recover one fifth of the sums paid by the plaintiff for flowage damages caused by the reservoir dam above the mills, and for repairs upon the dam, and also one fifth of the compensation for drawing the water from the reservoir. The case was submitted upon an agreed statement of facts, on which the Superior Court ordered that

the bill be dismissed ; and the plaintiff appealed to this court. The facts appear in the opinion.

The case was argued at the bar in October, 1894, and afterwards was submitted on the briefs to all the judges.

*A. M. Alger,* for the plaintiff.

*G. E. Williams,* for the defendant.

ALLEN, J.   The parties have agreed upon all the facts deemed to be material.

The Taunton Manufacturing Company built the reservoir dam on land owned by it in 1832, at a time when it was the owner of five mill privileges on the stream below, all of which were then in operation.   This dam was for the sole use of the mills upon said mill privileges, and was essential to the reasonable enjoyment of all of the water powers, as the natural flow of the stream during much of the year would be inadequate for furnishing power.

Under this state of things, the corporation in the first place, on August 12, 1833, conveyed to the Bristol Print Works Company the two lowest mills, the land being described by metes and bounds, " together with all the buildings thereon, and all the rights, privileges, easements, and appurtenances to the said land in any wise appertaining or belonging, and all the streams and water rights and power thereof, also the dam and force of water."

On September 6, 1833, the corporation conveyed the next lowest mill to Charles Richmond, under whom, through mesne conveyances, the defendant claims.   This deed conveyed the land and buildings, " and the water power, dam, and all the appurtenances and privileges thereto belonging " ; and contained further provisions as follows :   " First.   This conveyance is made subject to the right and privilege granted by said Taunton Manufacturing Company to the Bristol Print Works Company, their successors and assigns, to draw water from a reservoir of said Taunton Manufacturing Company through the premises herein described and conveyed, and to enter on said premises for the purposes of relaying and repairing the aqueduct and pipes leading through the same.   Secondly.   The said Richmond, his heirs and assigns, grantees of these premises, shall be held and obliged at all times to pay to the Taunton Manufacturing Company, their successors and assigns, one fifth part of all sums which they may be held or agree to pay for flowage or

damages to the proprietors of any lands by reason of any dam made or which may be made by said Taunton Manufacturing Company, or their successors or assigns, of any part of the estate of the said Taunton Manufacturing Company upon any stream or waters flowing to their mills. . . . Fourthly. This conveyance is made subject to the reservations and privileges granted to the Bristol Print Works by the Taunton Manufacturing Company. Fifthly. . . . The said Taunton Manufacturing Company, intending hereby to alien and assign unto the said Charles Richmond, his heirs and assigns, all and singular the rights, privileges, easements, and appurtenances to the said land in any wise belonging or appertaining, and all the streams, dam, water power and privileges, and head and fall of water (excepting as above excepted) for the considerations above mentioned and set forth. To have and to hold the lands, buildings, waters, and works aforesaid, with all and singular, the rights, privileges, easements, and appurtenances thereto belonging, and which have been or of right can be used or enjoyed therewith, unto him the said Charles Richmond, his heirs and assigns forever, except as above excepted."

The defendant contends that the above deed conveyed no right in the reservoir, and that the clause requiring Richmond and his heirs and assigns to pay one fifth of the damages for flowing is not binding on subsequent owners; and these are the principal questions which have been argued in the case. It is not disputed that the title and rights of the Taunton Manufacturing Company to the upper mill and privilege have come through mesne conveyances to the plaintiff.

If the construction of a deed is doubtful, the practical construction put upon it by the parties and their successors may be looked at in connection with the deed itself, and the circumstances existing at the time of its execution. *Reynolds* v. *Boston Rubber Co.* 160 Mass. 240, and cases there cited.

Until recently, the parties in interest have assumed, and have acted on the theory, that Richmond and his heirs and assigns had an interest in the additional water power created by the reservoir, and were bound to pay one fifth of the damages for flowing. This is shown by the following facts.

On July 15, 1835, the Taunton Manufacturing Company con-

veyed to James K. Mills and others the upper mill and privi-
lege on the stream, " with the dams and water privileges thereon,
together with all the right which said Taunton Manufacturing
Company have to flow the land between the premises hereby
conveyed and the bridge where the old road to Boston crosses
Canoe River; the dams, water privileges, and rights of flowage
hereby intended to be granted and reserved being fully set forth
in, and subject to, an agreement by and between the grantor
and grantees bearing even date with and to be referred to
always as a part of these presents." The said agreement pro-
vided, amongst other things, as follows: " First. The reservoir
dam at White's Bridge above Whittenton shall not be altered
in any mode without the consent of the parties therein inter-
ested or a majority of them. Provided, however, that the pro-
prietors of the Whittenton Mill shall always cause to be let
down from said reservoir a quantity of water sufficient to pro-
pel the present machinery of the Hopewell Mills [the Hopewell
Mills were next below the Whittenton Mill] until the water in
said reservoir shall be drawn down to the level of the present
Whittenton dam, and the proprietors of the Whittenton Mill
shall be entitled to a fair compensation from all the parties
interested in the said reservoir for the time and labor of drawing
the water as aforesaid. Second. The water between said reser-
voir dam and Whittenton Mills shall be used hereafter as has
been heretofore customary, that is to say, the Whittenton pro-
prietors shall do no act to prevent the natural flow of water
over their premises by raising their dam above its present
height. . . . Fourth. The damages accruing from time to time
for flowage shall be apportioned between the proprietors of the
Whittenton Mills and the mills now and formerly belonging to
the Taunton Manufacturing Company by the award of judicious,
persons," etc.

The defendant derived his title as follows. The title of
Richmond passed to Galen Hicks, under the foreclosure of a
mortgage dated October 4, 1833, in which reference was made
to the deed of the Taunton Manufacturing Company to Rich-
mond. On March 1, 1848, Hicks conveyed to Dean and Morse,
with a similar reference; and they in like manner, on April
1, 1849, conveyed to the Dean Cotton and Machine Company,

which in its turn, on November 28, 1874, conveyed to the Taunton Cotton and Machine Company the land and water privileges, "together with all the rights of flowage appurtenant to said estate, and all the right, title, and interest of the grantor in the Reservoir and Flowage Company [this company will be hereinafter described], and subject to all the liability on account of such rights, and in relation thereto reference may be made to an agreement between the Taunton Manufacturing Company and James K. Mills and others, dated July 15, 1835, . . . and to the award," etc.   On June 1, 1880, the Taunton Cotton and Machine Company conveyed the property to the Park Mills, a corporation, with this provision: "This conveyance shall also include whatsoever rights, title, and interest, with the liabilities thereon, said corporation has in the Taunton Reservoir and Flowage Company." On July 12, 1889, the Park Mills conveyed to Staples, the defendant, with a similar provision. On the same day, the Taunton Cotton and Machine Company also executed a deed of the same premises to the defendant, "together with all rights of flowage appurtenant to said estate, and all the right, title, and interest of the grantor in the Reservoir and Flowage Company, and subject to all the liabilities on account of such rights. And in relation thereto reference may be made to three papers, namely, 1st, an agreement between the Taunton Manufacturing Company and James K. Mills and others, dated July 15, 1835, . . . together with the award," etc.

The Reservoir and Flowage Company referred to in some of the above deeds was established as follows.

In 1852, the owners of the several mills, all being corporations associated together as a voluntary association under the name of the Taunton Reservoir and Flowage Company, "for the purpose of aiding in the supplying themselves with water by the reservoir dam," appointed Willard Lovering, one of the owners of the Whittenton Mills, their agent, from time to time, as the damages for flowing should become due, to collect their proportions thereof, and to pay the same to the owners of lands flowed. The annual damages for flowing were in the same year fixed by agreements at $1,842.89, and have not since been changed. These damages are fair and reasonable. From that

time to the present, Lovering (who died in 1875) and the successive owners of the Whittenton Mills have continued without objection, in behalf of the owners from time to time of the several mills, under the name of the Taunton Reservoir and Flowage Company, to collect from said mill-owners and to pay out said damages for flowing, and to repair the reservoir dam, and to draw water from the reservoir, and to collect from the several mill-owners their respective shares of the expense thereof. The defendant, however, without assenting thereto or dissenting therefrom, otherwise than is herein stated, refused from time to time as said charges accrued to pay any part thereof, on the ground that he had not used the water. Bills for the annual expense of maintaining the reservoir dam as rendered to the several mill-owners were usually made out under the general statement, "To Flowage," without setting forth items for repairs or for drawing the water; but sometimes the bills were itemized. In 1885, the reservoir dam having been injured by a freshet, it was repaired at an expense of $812.12, and the owners of all of said mills paid their proportional shares of such expense.

From the time of the execution of the above agreement to the present, the use of the reservoir dam, except as herein stated, has been in accordance with the terms of the agreement, and no person has objected thereto or made any claim inconsistent therewith; and all the mills, when operated, have had the enjoyment of the head of water created by said reservoir dam, and of the reserve waters thereby stored, and no person other than the owners from time to time has used the same or had any interest therein.

The water rights belonging to the two lower mill privileges have been legally extinguished by abandonment. The defendant's mill buildings are standing; the water-wheels are in position; but the dam at his mill was carried away by a flood a few months before the conveyance to him, and he has not operated the mill or used the water power, but he has not abandoned the same.

The defendant contends that the above agreement, whereby the Taunton Reservoir and Flowage Company was formed, was for a partnership, and was one which the corporations were not

authorized to make, under the decision in *Whittenton Mills* v. *Upton*, 10 Gray, 582. We have no occasion to consider that question. This agreement is referred to for the purpose of showing the practical construction put upon the grant to Richmond, and for this purpose it may be looked at, whether valid or invalid. The right of the plaintiff to maintain the bill in equity does not depend upon that agreement.

The owners of the defendant's mill, from the time of the conveyance to Richmond, in 1833, down to the time of its conveyance to the defendant, have annually contributed one fifth of the damages for flowing caused by the reservoir dam, and one fifth of the expense of repairing the same, and one fifth of the compensation for drawing the water from the same, and during said period, and from the time said reservoir dam was built, the motive power of said mill has been furnished by the water drawn from said reservoir, except that since steam came into general use steam power has also been employed. But since 1890 the defendant has refused to make such contribution.

The owners of the two lowest privileges contributed in like manner their proportion, as fixed by the award referred to, down to the time of the extinguishment of their water privileges; and the owners of the two upper privileges have also paid their respective proportions, according to the award.

Such being the facts, we come now to consider the question of the defendant's right and liability.

The reservoir would naturally be of some benefit to the lower mill privileges, without any express grant. But upon the construction of the deed to Richmond, taken by itself alone, and without reference to what followed, there would be strong reason for holding that some right, the extent of which is not defined, in the water power created by the reservoir dam was intended to be included in the grant. This water power was in actual use at the time of the grant, and was essential to the reasonable enjoyment of what was in terms granted. Moreover, the reference in the deed to the rights of the Bristol Print Works Company under the deed, then recent, of the grantor to that company, shows clearly that it was understood that some right in the water power created by the reservoir was included in that deed. The provision binding Richmond and his heirs and assigns to

pay one fifth part of the damages caused by the flowing to some extent implies that a similar right was intended to be granted to Richmond and his heirs and assigns. The conveyance includes in broad terms " all and singular the rights, privileges, easements, and appurtenances to the said land in any wise belonging or appertaining, and all the streams, dam, water power and privileges, and head and fall of water," with all " the rights, privileges, easements, and appurtenances thereto belonging, and which have been or of right can be used or enjoyed therewith." It would seem, therefore, even upon the deed alone, when construed in view of the facts then existing, that some right in the power created by the reservoir dam was by implication included. The plaintiff has cited several cases to show that there is an implied grant of whatever within the grantor's power is necessary to the beneficial enjoyment of the thing granted; and others may be found collected in *Case* v. *Minot*, 158 Mass. 577, 585. In this respect, the deed to Richmond is not like the deeds which were under consideration in *Brace* v. *Yale*, 4 Allen, 393, and *Whitney* v. *Wheeler Cotton Mills*, 151 Mass. 396, cited by the defendant.

But this construction of the deed, if otherwise doubtful, is made very clear by the subsequent acts of the parties. The whole plan was to treat the reservoir as existing for the common benefit of all the mill privileges which have been mentioned. This is shown especially by the agreement in 1835, and by the voluntary association formed by the owners of the several mills in 1852, under the name of the Taunton Reservoir and Flowage Company. The deed of 1874, in the defendant's chain of title, refers to both of these. The two deeds to the defendant himself, in 1889, both contain a like reference. The action of all the defendant's predecessors in title, and of the owners of the other privileges, has from the beginning been in accordance with this view as to the title. We find nothing tending in any degree to show that any other view was ever taken, till after the defendant's purchase in 1889.

Looking therefore at the deed itself under which the defendant's title is derived, and at the subsequent acts of the parties in interest, we are of opinion that a right to have the use and benefit of the reservoir was included in the grant to Richmond and his

heirs and assigns, and that such right has descended to the defendant. The extent of this right, and the manner of defining and enforcing it, we need not now consider.

The question then arises whether a court of equity should enforce against the present owner of the premises the stipulation in the deed that Richmond and his heirs and assigns should pay one fifth part of the sums paid for flowing or damages to the proprietors of lands above the reservoir dam.

In England, it seems to be the tendency of recent decisions to hold that the burden of a covenant, unless possibly one which amounts to a grant, never at law runs with the land, except as between landlord and tenant; and that in equity the court will not as against assigns enforce covenants calling for the payment of money, but only covenants which are merely restrictive as to the use of land. *Haywood* v. *Brunswick Building Society*, 8 Q. B. D. 403. *Austerberry* v. *Corporation of Oldham*, 29 Ch. D. 750. *Clegg* v. *Hands*, 44 Ch. D. 503. Gale on Easements, (6th ed.) 61, 62. Goddard on Easements, (4th ed.) 24.

This doctrine has not usually been accepted in the United States. It has been held in many decisions, in this Commonwealth and elsewhere, that at law the burden of a covenant may run with the land. *Savage* v. *Mason*, 3 Cush. 500. *Bronson* v. *Coffin*, 108 Mass. 175. *Richardson* v. *Tobey*, 121 Mass. 457. *King* v. *Wight*, 155 Mass. 444. *Joy* v. *St. Louis*, 138 U. S. 1, 34. *Fitch* v. *Johnson*, 104 Ill. 111. *Hazlett* v. *Sinclair*, 76 Ind. 488. *Norfleet* v. *Cromwell*, 64 N. C. 1. Pomeroy, Eq. Jur. 1295. It has also often been held elsewhere that a provision like that contained in the deed to Richmond is itself a covenant binding upon the grantee and his heirs and assigns; that it will run with the land; that it is valid in law; and that the relief granted by a court of equity is not to be limited to those covenants which are merely restrictive, but will be extended to covenants to do positive acts involving the expenditure of money. *Burbank* v. *Pillsbury*, 48 N. H. 475. *Kellogg* v. *Robinson*, 6 Vt. 276. *Atlantic Dock Co.* v. *Leavitt*, 54 N. Y. 35. *Bowen* v. *Beck*, 94 N. Y. 86. *Finley* v. *Simpson*, 2 Zabr. 311. *Sparkman* v. *Gove*, 15 Vroom, 252. *Maynard* v. *Moore*, 76 N. C. 158. *Georgia Southern Railroad* v. *Reeves*, 64 Ga. 492. *Conduitt* v. *Ross*, 102 Ind. 166. *Maxon* v. *Lane*, 102 Ind. 364. See also Rawle on Covenants, (5th ed.) § 272, *n.*

In this Commonwealth, however, it has been held that such a provision in a deed poll does not constitute a technical covenant. *Parish* v. *Whitney*, 3 Gray, 516. *Maine* v. *Cumston*, 98 Mass. 317. *Martin* v. *Drinan*, 128 Mass. 515, 516. In *Kennedy* v. *Owen*, 136 Mass. 199, 203, the court followed the earlier decisions in saying that such a provision is not technically a covenant running with the land, because the grantee sealed nothing ; but that it is rather " a mere personal obligation, imposed upon and assumed by the grantee, and binding upon him and his legal representatives as an implied contract entered into with the grantor ; . . . an obligation, which, if enforceable at all against purchasers, is to be enforced against them by a court of equity alone." That case did not call for the determination of the question whether such equitable remedy existed or not. The present case, however, raises that question.

An ordinary easement binding the granted premises may be created in favor of the grantor, his heirs and assigns, by words contained in a deed poll. *Atkins* v. *Bordman*, 2 Met. 457, 462. *Bowen* v. *Conner*, 6 Cush. 132, 135. The grantee's acceptance of the deed subjects the granted estate, both in his own hands and in the hands of all others who may come in under him, to the easement reserved. And we see no good reason why, under circumstances like those existing in the present case, an easement or servitude calling for the performance of positive acts may not also be created in like manner. This seems to be implied by the language of the court in *Dyer* v. *Sanford*, 9 Met. 395, 405. See also *Maine* v. *Cumston*, 98 Mass. 317 ; *Schwoerer* v. *Boylston Market Association*, 99 Mass. 285, 297, 298 ; *Woburn* v. *Henshaw*, 101 Mass. 193. It is binding upon the original grantee ; and his assigns with notice are bound in like manner, at least to the extent that the performance of the duty may be charged upon the land to which they succeed. The general doctrine of the equitable enforcement of agreements concerning the occupation and mode of use of real estate is explained in the familiar cases of *Whitney* v. *Union Railway*, 11 Gray, 359, and *Parker* v. *Nightingale*, 6 Allen, 341. We are brought, therefore, to the conclusion that the obligation imposed by the deed to Richmond may be enforced as an obligation in the nature of a servitude upon the estate of the defendant, though not as a personal obligation of the defendant.

The final question which we have to determine is whether the plaintiff is entitled to recover one fifth part of the cost of repairs upon the reservoir dam, and of the plaintiff's compensation in drawing the water, as well as one fifth part of the sum paid for flowing.

The deed to Richmond does not in terms include such cost of repairs. The language is, that Richmond and his heirs and assigns " shall be held and obliged at all times to pay to the Taunton Manufacturing Company, their successors and assigns, one fifth part of all sums which they may be held or agree to pay for flowage or damages to the proprietors of any lands by reason of any dam made or which may be made by said Taunton Manufacturing Company, or their successors or assigns, of any part of the estate of the said Taunton Manufacturing Company, upon any stream or waters flowing to their mills." This language does not admit of a construction which will bind Richmond and his heirs and assigns to pay for repairs of the dam. It is limited to sums paid for flowing to the proprietors of other lands.

Independently of this provision, the relation of the parties growing out of the conveyance of the mill privilege and water power would not bind the grantees to pay any part of the cost of such repairs. The right which was granted in respect to the reservoir was not any interest in the dam, but merely some right in respect to the flow of water in addition to that which the grantee would take as riparian owner. The ownership and immediate control of the dam remained with the grantor. The duty of exercising due care to make it safe rested with the grantor alone. The grantor and grantees did not become joint owners of the dam, and would not be jointly liable for damages in case of its giving way, by reason of negligent construction. A right to have a quantity of water, in addition to the natural flow of the stream, sent down from the reservoir, does not carry with it an ownership in the reservoir dam.

The agreement between the Taunton Manufacturing Company and James K. Mills and others, which was made a part of the deed from the former to the latter in 1835, is significant as showing the mode in which it was then understood that the water was to be used; but Richmond was not a party to it, nor does

the agreement contain anything to show that it was understood that he was to bear a part of the cost of making repairs.

The agreement entered into by the various mill corporations in 1852, under the name of the Taunton Reservoir and Flowage Company, contained nothing in respect to the cost of repairs, so far as is shown by the agreed statement of facts.

No distinct agreement or stipulation being shown calling for the payment of one fifth of the cost of maintaining the dam, we have to consider whether a servitude has been imposed on the defendant's land by prescription, requiring such contribution. It is agreed that the owners of the defendant's property, " from the time of its conveyance to Charles Richmond, in 1833, down to the time of its conveyance to the defendant, have annually contributed one fifth of the flowage damages caused by the reservoir dam, and one fifth of the expense of repairing the same, and . one fifth of the compensation for drawing the water from the same, and during said period, and from the time said reservoir dam was built, the motive power of said mill has been furnished by the water drawn from said reservoir." After describing the agreement of 1852 between the various mill corporations, the statement of facts recites that from that time down to the present Lovering and the successive owners of the Whittenton Mills have continued without objection to collect from the owners of the several mills the " flowage damages, and repair the reservoir dam, and draw water from the reservoir, and collect from the several mill-owners their respective shares of the expense thereof." The one party collected the money as a right, the other paid it as a duty. It would seem that the evidence is sufficient to establish such a servitude by prescription, if in law such a servitude can be so created.

The duty is of the same character as that which is created by the provision in the deed to Richmond, binding him and his assigns to pay one fifth of the sums paid for flowing. Its connection with the estate and rights granted is equally close. A covenant to make the payments would run with the land. A duty imposed on the grantee and his assigns by stipulation in the deed would be enforced in equity against the land. We see no reason why the same duty may not be established by prescription. In *Doane* v. *Badger*, 12 Mass. 65, it was recognized,

though not expressly decided, that where the owner of a close had an ancient right to take water from a well and pump situated on another close, he might be bound by prescription to keep the well and pump in repair. It is well established that there may be a prescriptive duty to maintain fences. *Bronson* v. *Coffin*, 108 Mass. 175, 185, and cases cited. Also ways. *Middlefield* v. *Church Mills Knitting Co.* 160 Mass. 267. See also *Lynn* v. *Turner*, Cowp. 86 ; *Kingston-upon-Hull* v. *Horner*, Lofft, 576, 586 ; where it was held that there may be a prescriptive duty of keeping the bed or banks of a stream in order. So, where a reservoir dam is maintained for the benefit of several estates, the duty of repairs in whole or in a specified proportion may be established by prescription as a charge against one of the estates in interest.

The duty of paying one fifth of the reasonable compensation for drawing the water rests on the same grounds.

For these reasons, in the opinion of a majority of the court, the payment of the whole sum claimed may be enforced against the land of the defendant.             *Decree for the plaintiff.*

FIELD, C. J.   I am unable to assent to the opinion of a majority of the court. That opinion in effect is that there has been acquired by prescription an easement or servitude in the land of the defendant and its appurtenances, whereby that land is bound to contribute one fifth part of the annual flowage damages caused by the reservoir dam erected by the Taunton Manufacturing Company in 1832, and one fifth part of the reasonable expenses incurred in repairing that dam, and one fifth part of a reasonable compensation for the time and labor expended in drawing water from the reservoir, in accordance with the requirements of the agreement of 1835. The case was submitted upon an agreed statement of facts. The defendant acquired his title to his land, being the Brick Mill and its appurtenances, by two deeds, each dated July 12, 1889. At that time the dam formerly on the land conveyed to the defendant had been carried away and had not been rebuilt, but the mill buildings were standing and the water-wheels were in position, and this condition of things has remained to the present time. The defendant has never operated the mills or used the water power,

although he has not abandoned any rights he may have in the water power or in the reservoir.

It is agreed in the statement of facts, among other things, as follows: " The defendant at the time he accepted his deeds did not have actual knowledge of the contents of the award alleged therein to have been delivered to him, or of any of the agreements herein mentioned, but the said award and agreements, and the books of the Taunton Reservoir and Flowage Company, running back for more than forty years, were then and ever since have been in the possession of the plaintiff, and, upon inquiry, the defendant could at any time have ascertained all facts which are herein stated, although he had no actual knowledge of the existence of the said books or agreements. This statement shall not, however, be so construed as to exclude a finding on the facts stated of constructive knowledge." Neither the defendant nor any of his predecessors in title, while owners or occupiers of the estate, was a party to any of these agreements or to the award.

There is much discussion in the opinion of the majority of the court upon the effect of the deed of the defendant's premises from the Taunton Manufacturing Company to Charles Richmond, dated September 6, 1833, and of the mesne conveyances under which the defendant claims title, as well as of the two deeds to the defendant, although this discussion seems not absolutely necessary to the decision. In the deed to Richmond, it is stipulated that the grantee, his heirs and assigns, " shall be held and obliged at all times to pay to the Taunton Manufacturing Company, their successors and assigns, one fifth part of all sums which they may be held or agree to pay for flowage or damages to the proprietors of any lands by reason of any dam made or which may be made by said Taunton Manufacturing Company, or their successors or assigns, of any part of the estate of the said Taunton Manufacturing Company upon any streams or waters flowing to their mills." This provision is referred to in the subsequent deeds. It covers, however, only one fifth part of the damages for flowage, and does not include any part of the expenses of repairing the reservoir dam, or of drawing off the water of the reservoir.

It is conceded by the majority of the court, that under our

decisions these stipulations on the part of the grantees in the several deeds do not constitute technical covenants on their part, because the deeds are deeds poll. Whatever may be true of covenants, I do not think that the promise on the part of the grantee which is implied from the acceptance of the deed can be held to create an easement or servitude in the land of the kind described in the opinion. The decision of a majority of the court does not proceed on the ground of any promise, express or to be implied, on the part of the defendant to perform the stipulations on the part of the grantee in the deed to Richmond, or the stipulations on the part of the grantees in any of the subsequent deeds which constitute the defendant's chain of title. The decree is not against the defendant personally, but it is a decree against his land, and it establishes a charge against this land, not only for one fifth of the damages caused by flowage, but also for one fifth of the expenses of repairing the reservoir dam and of drawing off the water. The decree proceeds on the ground of a right acquired by prescription more comprehensive than anything contained in any of the deeds under which the defendant claims title, which is in the nature of an easement or servitude inherent in the land, but which does not involve any personal obligation of the owner of the land. To establish this easement or servitude, the majority of the court rely upon the following clause in the agreed statement of facts: " The owners of the Brick Mill, from the time of its conveyance to Charles Richmond in 1833, down to the time of its conveyance to the defendant, have annually contributed one fifth of the flowage damages caused by the reservoir dam, and one fifth of the expense of repairing the same, and one fifth of the compensation for drawing the water from the same, and during said period, and from the time said reservoir dam was built, the motive power of said mill has been furnished by the water drawn from said reservoir, except that, since steam came into general use, steam power has also been employed."

The effect of this decision seems to me to be, that, when any one buys a mill privilege on a stream which at the time of the purchase is unused because the dam on the privilege has been carried away, if the stream has on it a reservoir dam belonging to other persons some distance above the mill privilege, and if

as a fact his predecessors in title have maintained the dam on the mill privilege and used the mill, and have also contributed to the maintenance of the reservoir for more than twenty years continuously, an easement or servitude is acquired by prescription in the land which constitutes the mill privilege, for the benefit of the owners of the reservoir, or as appurtenant to the reservoir, to have this contribution continued payable out of the land, even although the purchaser at the time of the conveyance of the mill privilege to him knew nothing of any such contribution, and the registry of deeds contained no information on the subject.

With perhaps one or two exceptions, easements in land are passive in their character, and when acquired by prescription consist in the right to use the servient tenement in a certain manner defined by an adverse user continued for the requisite period of time, and they are acquired by notorious acts done on the land under a claim of right.    Payments of varying sums of money from year to year by an owner of a mill privilege to the owners of a reservoir situated on the stream some distance above the privilege are not in their nature notorious acts done on the mill privilege.    It is said that there may be a prescriptive duty to maintain fences and ways, and *Bronson* v. *Coffin*, 108 Mass. 175, and *Middlefield* v. *Church Mills Knitting Co.* 160 Mass. 267, are cited.    The actual decision in *Bronson* v. *Coffin* was upon the effect of a covenant of the grantor in a deed.    *Middlefield* v. *Church Mills Knitting Co.* was decided upon a demurrer to the declaration, and it was said that the duty of the defendant to maintain the highway was " sufficiently alleged for the purposes of the case at bar."    The manner in which that duty originated did not appear in the declaration.    But if it be conceded, without expressing any opinion on the subject, that a duty to maintain fences and repair ways can be established either by prescription or by covenant, these are confessedly exceptions to the general rule that active duties cannot be attached to land. To deduce from these exceptions the rule that there can be attached to land by prescription an active duty to pay money from time to time for the maintenance of an artificial reservoir of water belonging to other persons, miles away from the premises, which is a permanent easement in the land whether the water is used

or not, is, so far as I know, attaching unusual incidents to land for which there is no precedent. Secret liens or interests in land, a knowledge of which cannot be obtained by a view of the land itself, or by a search in the proper registry of deeds, certainly ought not to be extended.

As the decision of the majority of the court rests, I think, upon the doctrine of prescription, I do not consider whether such incidents as are attached to the land of the defendant by the decision can be attached to land by covenants in a deed, or whether in the present case, from the stipulations in the deeds poll which concern the duty of the grantees, a promise can be implied against the present defendant to perform these stipulations, as a continuing promise to whosoever maintains the reservoir, or whether the deeds can be construed as deeds upon the condition that these stipulations shall be performed. Neither do I consider whether a court of equity in this Commonwealth will enforce stipulations for the payment of money contained in a deed poll against the assigns of the grantee. I dissent from the doctrine that, on the facts agreed in the present case, an easement in the defendant's land of the kind described in the opinion of the majority of the court has been established by prescription.

Justices HOLMES and LATHROP concur in this dissent.