ESSEX COMPANY *vs.* BENJAMIN B. GOLDMAN,
trustee, & others.

Essex. February 5, 1970. — May 5, 1970.

Present: SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Real Property,* Covenant running with the land, "Mill power." *Equity Pleading and Practice,* Declaratory proceeding, Decree, Damages. *Land Court,* Jurisdiction, Damages.

A covenant to pay a water power company a "perpetual annual rent" for a "mill power" to draw water from its canal, which was contained in an indenture whereby the company conveyed land adjacent to the canal and dam connected therewith, was designed to insure maintenance and repair of the dam and canal by the company, and was of benefit to its remaining property and to adjacent mill sites by assuring the availability of canal water, ran with the land and bound successors in title of the original grantee. [431–432]

Enforcement of a covenant running with land conveyed by a water power company, to pay it an annual rent for a "mill power" to draw water from its canal, was not inequitable as against successors in title of the original grantee by reason of alleged "radical changes" through nonuser of canal water by occupants of several mill sites and use of canal water for purposes other than the generation of power by occupants of other mill sites without returning the water to the canal; any acquiescence by the company in such other uses did not constitute an abandonment of its general plan to supply water for industrial purposes where water from the canal had always been discharged after use into a river and not used again. [432–433]

In a suit in equity for declaratory relief in the Land Court in which a final decree was entered declaring that the defendants were obligated to pay the plaintiff rent due for a "mill power" under a covenant running with land, the court had jurisdiction under G. L. c. 231A, § 5, and c. 185, § 1 (k), as amended by St. 1934, c. 67, § 1, to include in the decree an order that the defendants pay such rent. [434]

BILL IN EQUITY filed in the Land Court on December 19, 1966.

The case was heard by *Hettrick,* J.

*Albert P. Zabin* for Paul Realty, Inc.

*Herbert P. Wilkins* for Essex Company.

KIRK, J. ⌜The plaintiff, the Essex Company, brought this bill in the Land Court for declaratory relief under G. L.

c. 231A. It requested a declaration that the several defendants were obligated to pay certain rent. The defendant Paul Realty, Inc. (Paul Realty) appeals from a final decree in favor of the plaintiff.

The plaintiff was incorporated pursuant to St. 1845, c. 163, to construct a dam, locks and canals across the Merrimack River, and to create water power and use it, or lease or sell it to others, for manufacturing and mechanical purposes. The Essex Company constructed a dam and two canals, the North Canal and the South Canal, which the company owns and maintains. The dam causes water to flow into the canals and down the penstocks of the premises of those landowners who use the water, and then back into the river at various locations below the dam. See generally *Essex Co. v. County Commrs. of Essex*, 7 Gray, 450; *Essex Co. v. Lawrence*, 214 Mass. 79.

The land which is the subject of the controversy consists of about 145,000 square feet, located in Lawrence and bounded on the north by the Merrimack River and on the south by a line which runs parallel to the South Canal, fifty feet north of the north wall of that canal. The premises were conveyed in three separate parcels by the Essex Company between 1876 and 1895. The first grant was to Nathaniel W. and John W. Farwell in 1876, and conveyed a parcel of land and one "mill power." It was in the form of an indenture between the Farwells and the Essex Company, with certain "proposals" attached. The indenture between the parties provided that the grant was "[s]ubject to the agreements, terms, conditions and all other matters and things in the . . . annexed proposals . . . ." The proposals included among other things a definition of the term "mill power" as "the right to draw from the nearest canal or water course of the grantors, and through the land to be granted so much water as shall give a power equal to thirty cubic feet of water per second, when the head and fall is twenty-five feet," subject to certain limitations.

The proposals further provided that the plaintiff was to maintain the dam and canals, and that in order to provide

a fund to insure the maintenance and repair of the dam and canals, "each mill power with the land to which it is annexed shall forever be subject to a perpetual annual rent . . . and a perpetual annual rent . . . shall be reserved for every mill power hereafter sold . . . ." An annual rent of $1,200 was agreed upon, payable semiannually in equal instalments. In the event of the sale of a mill power and the land originally granted with the power, the assignees or purchasers were to be bound "to pay the rent of the mill power and land so sold, and to perform all the agreements, covenants and conditions relating thereto and connected therewith and the grantors [the Essex Company] will not hold the original grantees responsible therefor . . . provided, such assignee or purchaser shall in some legal mode satisfactory to the grantors bind himself to the said grantors . . . to perform, fulfill, keep and observe, all the terms, conditions, covenants, and all other matters and things touching the property and estate assigned, which were obligatory upon the original grantee . . . ." The failure of the grantees or their successors to pay any rent owed within ninety days after a "judgment" had been obtained in a "suit" for the rent would entitle the Essex Company to declare the land and the mill power forfeited.

In 1886, the Farwells sold the first parcel to the Farwell Bleachery. The Essex Company assented to the deed, and released the Farwells from their obligations on the 1876 deed. In 1888, the Essex Company conveyed an adjoining parcel to the Farwell Bleachery. In 1895, a third parcel, adjoining the other two, was conveyed by the Essex Company to the Farwell Bleachery. A condition of the deed was that the one mill power which had been originally conveyed to the Farwells and which had been conveyed to the Farwell Bleachery be held and operated by the Farwell Bleachery as appurtenant to all three parcels then held by the Bleachery, the whole to constitute one estate or mill site subject to the proposals attached to the indenture of 1876.

Through mesne conveyances, title to the premises and mill power vested in 1953 in the defendants, Benjamin B.

and Ethel I. Goldman as trustees of Jeds Realty Trust. Shortly thereafter, those defendants, for themselves as trustees and for their successors and assigns, agreed with the Essex Company to perform the obligations of the 1876 indenture and the annexed proposals, and of the deeds of 1888 and 1895 to the Farwell Bleachery, "including especially the obligation to pay from and after the delivery hereof the perpetual annual rent of $1200.00 payable semiannually on account of said Mill Power . . . ."

In 1957 the Goldmans as trustees of Jeds Realty Trust conveyed 8,200 square feet of the premises to the Demers Realty Company. The deed stated that no part of the mill power rent was to be allocated to that portion of the premises; the entire rent was to remain the responsibility of Jeds Realty Trust.

On June 29, 1962, the Goldmans as trustees of Jeds Realty Trust conveyed the remainder of the premises and the mill power to the defendant Paul Realty, "subject to and with the benefit of: the agreements, terms and conditions set forth or referred to in . . . [the deeds of 1876, 1888 and 1895] which the grantee [Paul Realty], by the acceptance of this deed, covenants to assume, perform, fulfill, keep, and observe."

The last payment of rent for the mill power was received by the Essex Company from the Goldmans as trustees of Jeds Realty Trust on May 7, 1962, for the rent period of September 1, 1961, to March 1, 1962. The Essex Company has since sent semiannual bills to the Goldmans on the first day of each rent period but has received no payment. Paul Realty leases its parcel to a firm which manufactures plywood and plywood furniture. The water from the canal is not used for power or for any other purpose.

The judge determined that the Goldmans, as trustees of Jeds Realty Trust, are obligated to pay the Essex Company all rents due on and after March 1, 1962, pursuant to their agreement with the Essex Company in 1953. He ruled that the covenant to pay an annual rent of $1,200, payable semiannually, runs with the land and with the mill power

appurtenant to the land. The final decree declared that the Goldmans were bound by the 1953 agreement and were obligated to pay the rent; that the Goldmans, Paul Realty, the successors of the Demers Realty Company and various other interested parties were bound by the provisions of the 1876 indenture and the deeds of 1888 and 1895, and by the provisions of the 1953 agreement between the Goldmans and the Essex Company, all of which instruments created a covenant running with the land; and that as a consequence all of the defendants are obligated to pay the rent. Paul Realty is the only defendant to appeal.

1. Paul Realty argues that it is not obligated to pay the rent for the mill power because it made no agreement with the Essex Company to pay the rent, and because the covenant to pay it is personal in character and does not run with the land. The argument assumes that the Essex Company would not be entitled to a declaration on or enforcement of the 1962 covenant between Paul Realty and the Goldmans in an equity suit to which the Goldmans were parties. We need not now pause to explore the validity of the assumption (see *Boston & Maine R.R.* v. *Construction Mach. Corp.* 346 Mass. 513, 521, and authorities cited at fn. 5) since the facts of the case before us show that the covenant to pay the rent does run with the land. The terms of the original conveyances by the Essex Company to the Farwells and the Farwell Bleachery are virtually identical to the terms considered in *Holyoke Water Power Co.* v. *Whiting & Co. Inc.* 276 Mass. 528, 534–535. There, as here, the indenture deed incorporated proposals of the water power company. The company assumed the duty of maintenance and repair of the dam and canals. The purchaser of the land received mill powers which were to be drawn "through the land to be granted," and obligated himself to pay a perpetual annual rent for "each mill power, with the land to which it is annexed." It was held at p. 535, that the "words of the grant and of the accompanying instruments, standing alone, have the effect of making the mill powers appurtenant to the land conveyed. This in-

terpretation has confirmation in the onerous agreements resting upon the grantor. One of the purposes of its incorporation was to construct and maintain the dam, and to create and maintain a water power for the benefit of those to whom it sold or leased the power thus developed, and it assumed the contractual obligation forever to maintain and keep in repair the canals. It is not likely that such financial burdens would be assumed by a corporation of that nature with respect to mill powers in gross, nor with respect to mill powers not appurtenant to specified land. The implications of such a grant of mill powers are that they are appurtenant to some estate and that they are not personal. *Willets* v. *Langhaar,* 212 Mass. 573, 575."

Paul Realty argues that the covenant to pay rent for the mill power does not bind it because it does not "touch and concern the land," nor does it benefit any dominant estate. Apart from what was said in the *Holyoke Water Power Co.* case, *supra,* we think it is obvious that the payment of the annual rent to the plaintiff, in order to insure the maintenance and repair of the dam and canals, benefits the property held by the plaintiff (consisting primarily of the dam and canals) and the land of adjacent owners of mill powers by assuring the availability of water from the canals. This benefit is ample reason to bind the land of the defendants. See *Whittenton Mfg. Co.* v. *Staples,* 164 Mass. 319, 325–328; *Everett Factories & Terminal Corp.* v. *Oldetyme Distil. Corp.* 300 Mass. 499, 504–509; *Boston & Maine R.R.* v. *Construction Mach. Corp.* 346 Mass. 513, 518–521. See also *Essex Co.* v. *Lawrence,* 214 Mass. 79, 90–91.

2. Paul Realty argues that the enforcement of the covenant to pay rent would be inequitable in view of what it terms "radical changes" in the uses of the mill sites along the canals. It appears that the occupants of several parcels along the South Canal do not use their mill powers, and that of those who do use the water several use it for the washing of wool, for sanitation, or for cooling and fire prevention systems, and do not return the water to the canal.

Only two occupants use the water for the generation of power. Paul Realty argues that those occupants who do not use the water, or who use it for purposes other than the generation of power, are using their premises for purposes other than "mills," in violation of the original proposals. It argues further that these uses constitute an abandonment of the original plan of development of the land, the dam and the canals, and that the Essex Company has acquiesced in that abandonment. Paul Realty relies in part on *Holyoke Water Power Co.* v. *Whiting & Co. Inc., supra,* 276 Mass. 528, where the holder of a mill power was held to be restricted to the production of power by water wheels. *Id.* at 537–540. Although, as we have noted, the terms and purposes of the conveyances involved in that case were almost identical with the conveyances here, one distinguishing factor is that in the *Holyoke Water Power Co.* case the construction of the dam and canals made it necessary that the water be returned to the canal system after use; the water from the Essex Company's canals are, and apparently always have been, discharged after use into the Merrimack River below the dam, and are not used again. Thus any acquiescence by the Essex Company in uses of the water for purposes other than the generation of power cannot be construed as an abandonment of the general plan to supply water for the needs of industry.

There is no evidence of so substantial or radical a change in the conditions of the sites along the canals as to render inequitable the enforcement of the covenant to pay rent. The fact that Paul Realty, like several other occupants along the canal, chooses not to avail itself of the right to use water from the canal does not remove the burden from its land. See *Whittenton Mfg. Co.* v. *Staples,* 164 Mass. 319, 324.

3. The bill of the Essex Company included a prayer that the judge of the Land Court render a "judgment" for rent, and a prayer that the court retain jurisdiction for ninety days after notice of the judgment, so that further decrees could be entered in the event the judgment was not satisfied. The judge held that he was without jurisdiction under

G. L. c. 231A, § 5, to render a judgment for rent, and denied the prayer to retain jurisdiction for ninety days. The final decree declared the obligations of the defendants, including Paul Realty, to pay the rent due on March 1, 1962, and thereafter, and declared that the Essex Company had a right to declare a forfeiture "if and when any judgment for the rent due is not satisfied within ninety days after notice thereof."

The entry of a "judgment" would not be appropriate in a proceeding in equity. *Malloy* v. *Carroll,* 287 Mass. 376, 390–391. But a final decree in a bill for declaratory relief should determine "the whole controversy between the parties and should . . . [leave] for future determination no issue reasonably raised by the bill and prayers for relief, including the prayer for general relief." *Vesce* v. *Gottfried,* 353 Mass. 568, 569. *Trustees of Dartmouth College* v. *Quincy,* 331 Mass. 219, 227–228. *Zaltman* v. *Daris,* 331 Mass. 458, 462.

General Laws c. 231A, § 5, does not require that a separate petition for consequential relief be brought where the court which hears the bill for declaratory relief has jurisdiction to grant the further relief. See *Nissenberg* v. *Felleman,* 339 Mass. 717, 724; G. L. c. 231A, § 1. See also *Trustees of Dartmouth College* v. *Quincy, supra; Flanagan* v. *Lowell Housing Authy.* 356 Mass. 18, 21–22. Under G. L. c. 185, § 1 (k) (amended by St. 1934, c. 67, § 1), the Land Court has jurisdiction of all "matters of equity cognizable under the general principles of equity jurisprudence where any right, title or interest in land is involved, except suits in equity for specific performance of contracts." See *Lynn Inst. for Sav.* v. *Taff,* 314 Mass. 380, 383–384. This jurisdiction may, in a proper case, include the award of damages. *McCarthy* v. *Lane,* 301 Mass. 125, 130–131. This is such a case.

4. Paragraph 4 of the final decree is to be modified by ordering the defendants named in paragraph 3 of the decree to pay to the Essex Company the unpaid rent which became due on March 1, 1962, and thereafter while they were in privity of estate with the Essex Company on account of the mill power, and by declaring that the Essex Company is

entitled to declare the land and mill power forfeited and to re-enter upon it in the event that the rent is not paid within ninety days of notice of the decree. Thus modified, the decree is affirmed.

*So ordered.*