ATLANTA MILLS *vs.* JOHN N. MASON & others.

Worcester.    October 5. — 6, 1874.    COLT & MORTON, JJ., absent.
            Oct. 6, 1874. — May 22, 1876.   COLT, MORTON & LORD, JJ., absent.

A motion for a trial by jury on issues of fact in equity should ordinarily be made before the case is referred to a master; and will not be granted after the coming in of his report, if the issue was made by the pleadings, and the case referred to the master without objection, and heard before him at great length, and the evidence before him is not reported, and there is nothing to show that the master's conclusion is unsatisfactory or that the case can be better tried by a jury.

On a bill in equity by the owner of a mill privilege against the owner of another mill privilege, lower down the same stream, to restrain him from maintaining his dam at too great a height whereby the water was set back, the report of a master, to whom issues of fact were referred, found that the setting back of the water was directly attributable to the maintaining of the defendant's dam at a greater height than he was entitled to maintain it, and did not directly negative certain acts of the plaintiff which the defendant contended caused the water to set back. *Held,* that the report sufficiently passed upon the question at issue.

The owner of an estate on a stream, entitled to a share in the water power belonging to an upper privilege on the stream, cannot affect the rights of the other owners in that privilege by a grant to an owner of the lower privilege; nor by declarations *in pais,* made at the sale, as to what the rights of the upper privilege are.

On a bill in equity by the owner of a mill privilege against the owner of another mill privilege, lower down the same stream, to restrain him from maintaining his dam at a greater height than he is entitled to maintain it, the defendant may have alleged infringements by the plaintiff, of his rights in the use of the stream, determined by a cross bill.

If an easement is created by grant, it does not cease, although the necessity for it ceases.

The owner of an upper and a lower mill privilege conveyed the upper privilege, reserving, for the benefit of the lower privilege, all the water, which could be drawn through the waste gate, when the water ran over the rolling dam. *Held,* that the reservation was general, however the lower privilege might afterwards be used.

That unity of titles in the dominant and servient estates should operate to extinguish an easement, the ownership of the two estates should be coextensive; and if a person holds one estate in severalty, and only a fractional part of the other, the easement is not extinguished.

The owner of an upper and lower mill privilege appropriated to the lower estate the water which would be conducted thither by the tail race of the upper estate, and conveyed the upper estate, but not the land between the tail race and the river, and the only way in which the water used on that portion of the upper estate could return to the river was through the lower estate. The purchasers of the upper estate afterwards opened a trench through the intervening land, against the objection of the owners of the lower estate, to whom the land belonged, by which the water of the tail race was discharged directly into the river. *Held*, that a subsequent purchaser of the lower estate had the right to object to this diversion of the water and to have the trench closed.

BILL IN EQUITY, filed October 27, 1871, against John N. Mason, Thomas J. Harrington, Benjamin Flagg and George A. Flagg, tenants in common of the estate known as the Millbury Cotton Mills. The bill alleged the following facts :

The plaintiff is and for six years past has been seised in fee of certain real estate situated in said Millbury, known as the Atlanta Mills estate. During this time it has had thereon a woollen mill and machinery carried by the water of the Blackstone River. The defendants own and occupy certain real estate in Millbury, situated below said premises on the same stream. The defendants have a right to maintain a dam on their said premises, and to flow back the water in the plaintiff's raceway so far as was flowed by the old dam in said raceway.

The defendants claim the right to maintain a dam across said river to a point much higher than their dam across said raceway, and have in fact, without right, so maintained a dam and set back the water of said stream upon the plaintiff's land, and thereby impeded its machinery and injured it in its business, and threaten to continue thereby to set back upon the plaintiff's land the waters of said stream, which will interrupt and destroy the plaintiff's business and cause it irreparable injury.

The bill prayed that the defendants be enjoined from setting back said waters upon the estate of the plaintiff, and that the court would ascertain and regulate the precise height, if any, to which the defendants might lawfully raise said waters, and cause an account to be taken of the damages hereby caused by the defendants, and for further relief.

The defendants in their answer set up a right to maintain their dam at its then height ; and by a cross bill alleged certain injuries to the defendants by the diversion by the plaintiff of water to which the defendants were entitled.

The case was, at April term 1873, referred to a master " to find the facts in issue." On the coming in of the master's report, the defendants moved, before *Devens*, J., that the case be sent to a jury to determine, upon an issue to be framed, the height at which the defendants were entitled to maintain their dam. The judge ruled that the defendants were not entitled to have this question submitted to a jury, and reserved the question of their right, and the questions arising on the report of the master, for the consideration of the full court.

By direction of the court, the case was first argued on the question of the right of the defendants to have the issue of fact submitted to a jury.

*G. F. Verry*, for the plaintiff.

*W. W. Rice*, ( *G. A. Flagg* with him,) for the defendants.

GRAY, C. J. Issues of fact in equity may either be tried by a master, and, upon exceptions to his report, by the court; or be tried by a jury. If a party intends to demand a trial by jury, he should ordinarily do so before the case is referred to a master.

The court, in its discretion, may doubtless order an issue to a jury even after the coming in of the master's report, if the evidence produced before the master appears to be conflicting, or his finding thereon is unsatisfactory, or the hearing before him has developed new questions of fact, or if, for other reasons, the court deems it fit that any issue in the cause should be tried by a jury.

But in the present case the issue as to the height of the dam was made by the pleadings, the case was referred to a master without objection by either party, the hearing before the master occupied a month, and the evidence is not reported, so that there is nothing from which the court can see that the master's conclusion is unsatisfactory, or that the issue can be better tried by a jury. Under these circumstances, to supersede the master's report and order a trial by jury, merely because a party who has been fully heard before the master is dissatisfied with the result, would be to grant an unreasonable indulgence to him, and to do great injustice to the other party.

*Motion refused.*

The case was then argued on the pleadings and the master's report, by the same counsel. The facts appear in the opinion.

DEVENS, J.   The plaintiff and the defendants are owners of privileges upon the same stream, and the grievance complained of in the original bill is that the defendants, owning the lower privilege, maintain their dam at a greater height than they are properly entitled to do, thereby throwing water back upon the wheels of the plaintiff's mill. The parties each derive title from Asa Waters, who in 1833 owned both privileges.

The title of the plaintiff to the upper estate is derived, by mesne conveyances, from a deed of Asa Waters, of the date of 1837, of a portion thereof to Hale and Whipple, consisting of what were then known as the yellow, grinding and finishing shops, and the northwesterly part of the old forge shop. By this deed was conveyed " one half of the water power, and no more, belonging to what is called the Armory dam." The remainder of the upper estate, known as the Armory shop, with the other buildings used in connection therewith, which were operated by water from the Armory dam, was then owned by Asa and A. H. Waters, (one half thereof having been conveyed previously to A. H. Waters by Asa Waters,) and to this portion the plaintiff now has title derived from Asa and A. H. Waters.

At the time of making the deed to Hale and Whipple, Asa Waters owned the lower privilege, then known as the grist-mill privilege, and continued to be the owner thereof until his decease, after which, by authority of the Probate Court, the same was conveyed by A. H. Waters, as administrator of the estate of Asa Waters, in June, 1844, to Luke Harrington, and the title thus conveyed is now held by the defendants.

As it was contended that the defendants were entitled, as against the upper estate, to no greater rights than those which existed at the time of the making of the deed by Asa Waters to Hale and Whipple, it became, at the hearing before the master, a question of fact whether the cotton-mill dam as now maintained by them, which has been substituted for the grist-mill dam, was higher than the grist-mill dam then was, and whether it caused the water to set back upon the wheels of the upper estate more than the grist-mill dam formerly did, thereby impeding them. It was disputed whether the defendants were entitled to main-

tain their dam to the height indicated by a certain bolt, known as the Aikin bolt, or only to that indicated by the Cunningham bolt, which was five inches lower. It was found by the master that the latter indicated the height to which the dam could be maintained, and that as now maintained it was five inches higher than the grist-mill dam, thereby causing the water to set back and impede the action of the plaintiff's wheels, and that the water thus set back and impeding the plaintiff's wheels, as they now exist, would, to the same extent and on the same occasions, have set back on and impeded the wheels as they formerly existed, had the use of the original wheels continued.

This finding is not open to the objections suggested by the defendants, that it does not clearly appear thereby that, if the plaintiff's wheels and tail-races had remained as they were when the cotton-mill dam was built to its present height, it would not have set back water upon the plaintiff's wheels; and further, that while the plaintiff has wrongfully deepened a tail-race directly from the wheels into the river, it does not show that this tortious act does not contribute to the injury complained of. But the finding distinctly attributes the setting back of the water, and the impeding thereby of the plaintiff's wheels, to the additional height of the dam as now maintained, which is the grievance alleged by the plaintiff, and this is sufficient without expressly negativing other causes which the defendants contend may have produced it.

When the defendants purchased their estate, the dam was at its present height, and it is contended further by them that, upon the facts shown in reference to that purchase, the plaintiff is now equitably estopped from asserting that it is too high, even if otherwise it might properly do so. The defendants purchased at public auction of D. Atwood, as receiver of A. H. Waters & Co., on April 22, 1868. At that time, Atwood, as such receiver, owned the lower privilege, also one half of the Armory shop portion of the upper privilege, together with one half of the half water power belonging thereto. The other half of the Armory portion of the upper privilege was owned by Asa H. Waters. The remaining portion of the upper estate was that originally conveyed by the Hale and Whipple deed. Of this, Atwood owned the old forge shop and one third of the half water power con

veyed by the Hale and Whipple deed, together with the finishing shop and water belonging thereto. Ruggles & Co. owned the yellow shop, grinding shop, &c., included in the Hale and Whipple deed, together with two thirds of the one half water power conveyed by that deed, subject to the right of water belonging to the finishing shop.

The deed made by Atwood on April 22, 1868, as well as that made contemporaneously to him by A. H. Waters, professed to convey the right to maintain the dam as it then stood, to the height of the Aikin bolt. But as these parties owned but a portion of the upper privilege, such conveyance could not operate as a division of the upper and lower privileges as defined by the dam. It was not in the power of the owner of one estate, entitled to a share in the water power belonging to the upper privilege, to affect the rights of the owners of other estates in that privilege by a grant to the owner of a lower privilege. Holding those rights, the plaintiff is entitled by virtue of them to have the dam reduced to its proper height. In no other way can it enjoy the rights which properly belong to it. The estoppel asserted by the defendants does not affect the plaintiff's whole estate. There is no estoppel which affects the right which it has as grantee of that portion of the estate formerly held by Ruggles & Co.

Nor is the plaintiff estopped by reason of the declarations made by A. H. Waters and W. H. Harrington at the time of the sale to the defendants, substantially, as alleged, to the effect that the dam was then at its proper height. Even if all the facts necessary to constitute an estoppel as against Waters or W. H. Harrington personally existed, they could not affect the plaintiff's right, as grantee of the estate of Ruggles & Co., in the upper privilege. A purchaser without notice is not affected by an estoppel *in pais* which may bind his vendor: *Miller* v. *Washburn,* 117 Mass. 371. Bigelow on Estoppel, (2d ed.) 337, and cases cited. At the time the declarations were made, neither Waters nor W. H. Harrington appears to have been an officer of the plaintiff corporation; neither of them had any ownership in the Ruggles & Co. estate. The plaintiff owned nothing in any portion of these privileges, although it was lessee of part of them. The fact that W. H. Harrington afterwards bought the

Ruggles & Co. estate, in 1869, and at a subsequent period, in 1871, when he was a manufacturing agent for the plaintiff, conveyed to the plaintiff, would not charge the estate, as against the plaintiff, with any estoppel *in pais*.

The plaintiff is therefore entitled to a reduction of the dam to the point where the master finds the cotton-mill dam was rightfully maintained, namely, that indicated by the Cunningham bolt, and to the damages as found for its maintenance at a greater height.

By their cross bill, the defendants allege that certain injuries have been done to them by the plaintiff in the occupation of its estate. As these alleged grievances relate to the subject matter presented by the plaintiff's bill, namely, the rights of the respective parties in the use of the stream which furnishes the power for each privilege, they are properly to be now considered, in order that, if they exist, they may be redressed here. The plaintiff, in seeking the aid of a court of equity, should itself be prepared to do equity.

The defendants have been deprived by the plaintiff of the means of, and prevented from raising, the waste gate, by which, until September, 1871, the owners of the lower estate had been accustomed to draw water whenever it flowed over the rolling dam for the use of their privilege. By the deed, made to Hale and Whipple by Asa Waters in 1837, the grantor reserved to himself the right of drawing water through the waste gate of the north flume of the old forge shop whenever the water ran over the rolling dam, and granted the right of shutting said waste gate as soon as the water ceased so to run. This reservation was for the benefit of the privilege below, and when, in 1844, the lower estate was conveyed, the grantee under that conveyance was entitled to take the water as provided for by the reservation of Asa Waters. Whether or not this right is now absolutely or reasonably necessary to the enjoyment of the lower privilege, is unimportant as affecting the right. It is found to be of value; it was not created by the fact that it was necessary for the enjoyment of the lower privilege, but arose from the express grant made to the defendants, their grantor having the right so to grant by virtue of the reservation which he had made in the conveyance of the property subjected by it to a servitule.

Not arising from necessity, this right does not cease with the necessity, and the defendants are entitled to insist upon being restored by the plaintiff to such position as will enable them to exercise it.

It is argued that the reservation in the Hale and Whipple deed was for the benefit of the grist-mill for which the lower privilege was then used, and that no right could be conveyed to the use of the easement for the purpose of supplying water for the large cotton factory for which it is now used. But the extent of the grantor's right to use the water was in no way limited by the needs of the grist-mill below as it then existed or was then used. The reservation was a general one of all the water which could be drawn through the waste gate, when the water ran over the rolling dam, and was for the benefit of the lower privilege, how ever that might be used.

Nor has there been any unity of title such as would destroy the right of the owner of the lower estate to this waste water, so that the question whether, when the lower estate was again sold, this right, even if once merged, would be revived, need not be discussed. That unity of title in the dominant and servient estate should operate to extinguish an easement, the ownership of the two estates should be coextensive. When a person holds one estate in severalty and only a fractional part of the other, there is no extinguishment of an easement. Washburn on Easements, 518. In 1868, when the property of A. H. Waters & Co. (consisting of A. H. Waters, T. J. Harrington and Benjamin Flagg) passed into the hands of a receiver, they were the owners of the lower estate and also of the northwesterly part of the old forge shop which was a part of that which was conveyed to Hale and Whipple, and of one third of the one half water power conveyed by the same deed; but the other real estate conveyed to Hale and Whipple, together with two thirds of the one half water power, was owned by Ruggles & Co., and had never been the property of A. H. Waters & Co.

The right which the lower estate possessed was not merely the right to have and use the penstock and gate, but also the right to a certain supply of water from the Armory pond. It was not, therefore, extinguished by this partial unity of title; and when the lower estate was conveyed to Atwood, the receiver, and by

Atwood to the defendants, with all its privileges and appurtenances, it continued to exist and passed by the conveyance.

Even if the waste gate was situated upon, and the water was drawn through, the portion of the Hale and Whipple estate owned and occupied by the owners of the lower estate, the servitude imposed by the right thus to draw it was upon the whole of the Hale and Whipple estate.

The defendants are, therefore, entitled to be restored to the use of the waste gate, and to such damages as the master finds they have sustained in being deprived of such use.

At the time when the Hale and Whipple deed was made, the water, after being used upon the premises thereby conveyed, was conducted into the mill pond of the lower estate by the tail-race, and the lower estate was accustomed thus to receive it, such water being at that time absolutely necessary for the enjoyment of the lower estate. This water has, since 1857, to some extent, and more largely, since 1871, been diverted from the tail-race and turned into the river. It is thus mingled with the other water, and, although, confined by the dam below, it reaches the defendants' mills, it does so more circuitously and affords them less benefit. Of this diversion the defendants complain; and while the water thus conducted is not necessary to the mill below, the right so to receive it is of value, and its diversion occasions a positive injury for which the master estimates the damages at a certain sum per month.

At the time when Asa Waters owned both estates, in the division, which he had a right to make, he had appropriated to the lower privilege the water which would be conducted thither by the tail-race of the upper estate, and when Asa Waters sold the Hale and Whipple estate, he had a right to receive at the lower estate the water as the flow of it had been arranged. By the Hale and Whipple deed, the land that lay between the tail-race and the river was not sold, and the only way in which the water used on that portion of the upper estate could return to the river was through the lower estate. It was one of the incidents to the proprietorship of the Hale and Whipple estate that its owner should permit the water to pass down the tail-race to the lower mill, and the right thus to receive the water was a part and parcel of the lower privilege. The right which the defend

ants have was granted to them as part of their estate; it is still beneficial and of value, and is not terminated by their construction of a new dam by which the water in the bed of the river is more effectually confined.

Nor are the defendants deprived of this right by any acquiescence in the acts of the grantors of the plaintiff in the diversion of this water. In 1857, (the new dam having then been constructed,) Harrington, Heald & Co., who then had two thirds of the one half power, opened a trench through land not their own for the purpose of discharging the water directly into the river. At that time A. H. Waters & Co. owned the lower privilege, and also with A. H. Waters that portion of the upper estate upon which this was done by Harrington, Heald & Co., and objected thereto. As against the lower privilege nothing could be gained by this act, and when afterwards the receiver of A. H. Waters & Co. sold the lower privilege, his grantees had the right to object to it. Nor were they estopped to do so under such circumstances, even if, when they bought, the apparent use of this trench was to conduct the water directly into the river. They were not in the position in which they would be if A. H. Waters & Co. had done or consented to the doing of this, and had afterwards sold the lower privilege with this act done by their consent to its disadvantage.

As, when the defendants bought in 1868 of the receiver of A. H. Waters & Co., they had the right to object to the existence of this trench, it does not affect their rights that afterwards, in 1871, A. H. Waters, who then had title thereto, sold the land where this trench was cut to the plaintiff. It is found as a fact that since this purchase the plaintiff has deepened and widened the trench so that the water from the tail-race has been discharged for the most part into the river. To the use of the water thus diverted the defendants are entitled to be restored by closing the trench cut by the plaintiff, and also to the damages as found by the master for its diversion.          *Decrees accordingly.*