Carroll,       }
Dec. 3, 1901. }

HORNE & a. v. HUTCHINS.

Under a conveyance, for a substantial consideration, of a tract of land with
mills thereon, together with the "right to use the water-power and mill
privilege on said premises," the grantee and his assigns are entitled to the
use of power derived from a reservoir owned by the grantor, upon which
the mills have been wholly dependent for many years.

Such deed does not entitle the grantee to the exclusive use of the reservoir,
as against a mill privilege owned by the grantor and dependent upon the
same source of power, merely because at the date of the conveyance the
latter privilege was dormant and unemployed; and in the absence of a
finding of a prescriptive right or a previous abandonment of the unused
privilege, the right conveyed is only the use of the reservoir so far as
reasonably necessary to the beneficial enjoyment of the granted premises.

The water rights to which a grantee of a mill privilege is entitled under a
deed are not affected by a decree of a court of equity enjoining him from
interfering and intermeddling with his grantor's control of structures at
the outlet of the reservoir from which his power is derived.

BILL IN EQUITY. The facts were found by a referee and are
sufficiently stated in the opinion. Transferred from the April
term, 1900, of the supreme court by *Parsons*, J.

*Leslie P. Snow* and *Sewall W. Abbott*, for the plaintiffs.

*James A. Edgerly* and *Arthur L. Foote*, for the defendant.

REMICK, J. This is a bill in equity to determine water rights.
The waters involved, mentioned in the order of their natural re-
lation, are Smith's pond, Whitten's river, Crooked pond, and
Smith's river, in the town of Wolfeborough. Smith's pond is the
head of the series. Whitten's river is the outlet to Smith's
pond, connects it with Crooked pond, and is about eighty rods
in length. Smith's river is the outlet of Crooked pond, is
about one hundred rods in length, and empties into Lake Win-
nipiseogee. In the report of the referee, the printed case, and
the briefs and arguments of counsel, three dams are referred to,
as A, B, and C, respectively. A is at the outlet of Crooked
pond and is a reservoir dam, built and maintained to store the
water of Crooked pond, Whitten's river, Smith's pond, and their
watershed for uses below, and has no immediate mill connection.
B is a mill-dam and is situated on Smith's river, about forty rods
below the reservoir dam, at what has long been known as the

"factory privilege." C is also a mill-dam, on the same river, about sixty rods below the factory privilege, upon what has long been known as the "mill lot." The plaintiffs are in the operation of mills at dam C. The defendant is in the operation of a mill at dam B. The mills at C and B are both dependent upon dam A and the water stored by it for power; and the object of the present proceeding is to determine the respective rights of privileges C and B to this source of power.

Whether the plaintiffs have any rights in the reservoir, and if so what, depends upon the meaning and effect of a deed of the dam C privilege from the Winnipiseogee Lake Cotton and Woolen Manufacturing Company to Elisha Goodwin, dated November 29, 1854, as follows: "A tract of land situated in said Wolfeborough containing one acre more or less, with the grist-mill and sawmill standing thereon, . . . together with the following described right or privilege in the use of the water, to wit, the right to use the water-power and mill privilege on said premises at such times as said company shall not consider the same as interfering with the use of Smith's pond above said premises as reservoirs for the supply of water for mills anywhere upon the Winnipiseogee and Merrimack rivers, which right and use said company do fully reserve and do not convey, the said company having the right to detain and hold back or to discharge the water of said ponds at such times as they may think proper for the advantageous use of said reservoir."

As the deed is somewhat general and ambiguous in its terms, the circumstances leading up to and surrounding its execution, as well as the subsequent practical construction of the parties, become important to a correct ascertainment of their intention.

From the bill in equity of 1866, the allegations in which are admitted to be true for the purpose of the present case, and from the record as a whole, it appears "that on or about the year 1780 a dam was erected at the outlet of said Crooked pond, and a grist-mill and sawmill erected on said Whitten's [now known as Smith's] river, which was operated by water-power created by said dam"; that the dam above referred to is to all intents and purposes the present reservoir dam A, and the grist and saw mills referred to are the present grist and saw mills situated at dam C; that ever since 1780 the successive owners of the grist and saw mills had claimed, and, except when prevented by the low state of the water in said Smith's and Crooked ponds, or other accidental causes, exercised the right of keeping up the water in the above-named ponds and in Whitten's river, and of drawing down the same by means of said dam at the outlet of Crooked pond for the purpose of creating water-power for said mills; that the owners

of the grist and saw mills at dam C had not only claimed and exercised the right above stated ever since 1780, but said grist and saw mills had during the time been "wholly dependent on the power created by said dam at the outlet of said Crooked pond, to do business"; that the Winnipiseogee Lake Cotton and Woolen Manufacturing Company, being engaged in manufacturing at Folsom Falls in Gilford on the Winnipiseogee river, and having been authorized "to acquire and hold . . . such real and personal estate, not exceeding in the whole . . . one million dollars, as may be necessary to improve the water-power of the Winnipiseogee, Pemigewasset, and Merrimack rivers, and for that purpose to make such contracts and grants to and with the proprietors and owners of lands, mills, and mill privileges on the said rivers and other tributary streams and waters as may be necessary to accomplish those objects" (Laws 1846, c. 437, s. 2), on August 1 and 14, 1854, purchased of Lydia F. and Daniel Pickering "the lands, mills, and mill privileges and rights [at dam C], including any and all rights of the grantors of drawing water from Smith's pond and Crooked pond and of using said ponds as reservoirs," and two thirds in common of the factory lot [dam B] with the water-power and privilege thereto belonging; that on August 30, 1854, the company purchased one sixth of the remaining one third of the factory lot of Jason Chamberlin and others, heirs of Nathaniel Rogers, and on July 27 and August 18, 1854, of Mark Lucas and Zachariah Batchelder, respectively, the lands at the outlet of Crooked pond, and under and around the reservoir dam.

Other purchases of lands and rights about the waters in question were made by the company from time to time, and it is conceded that by these several purchases "the Lake Company had acquired title to all the lands and water rights now in controversy"; that the several deeds effecting this unity of title, although made and executed at different times, were all recorded September 13, 1854, and, manifestly, were all obtained in pursuance of one controlling purpose, namely, to secure and develop the reservoir as a water supply for mills upon the Winnipiseogee and Merrimack rivers; that owing A, B, and C,— "all the lands and water rights now in controversy,"— for the controlling purpose already mentioned, the Lake Company, on November 29, 1854, conveyed to Elisha Goodwin the privilege at dam C in the manner and form already shown; that the estate thus conveyed to Goodwin was subsequently passed and conveyed by various mesne conveyances to the present owners at dam C, all of whom took subject to the provisions of the Goodwin deed; that the Lake Company retained privilege B and the land under and about reservoir dam A, built a new reservoir dam in place of the old one,

and made additional purchases and improvements to increase the capacity and utility of the reservoirs " for the supply of water for mills upon the Winnipiseogee and Merrimack rivers," expending in all about forty thousand dollars; that the value of the reservoir as a water supply to mills upon the lower river was overestimated; that little use was made of it for that purpose, but the company continued to hold the property until January 22, 1889, when, for the consideration of six thousand dollars, they conveyed the same to Brewster and Martin, as follows: "All the real estate of every kind in the said town of Wolfeborough . . . and all right of flowage and drainage, and all easements of whatever kind now appurtenant to and with the dam situated on said premises"; that after several intermediate conveyances, on March 30, 1894, the defendant Hutchins succeeded to all the rights acquired by Brewster and Martin by the terms of the above conveyance, subject to certain reservations which have no relation to the present case; that during the period of these several conveyances, *i. e.*, from the Goodwin deed in 1854 until the Hutchins deed in 1894, no other use was made of the reservoir by the predecessors of Hutchins than to supply power to mills on the Winnipiseogee and Merrimack rivers, while the owners at C (the factory privilege being during this time " unimproved and unemployed ") had the full benefit of the reservoir, subject only to such use; that no rights were acquired or lost by the conduct of the parties during this period; that in the summer of 1866, the owners of dam C, being for some reason dissatisfied with the way the company was using the reservoir, assumed by force absolute dominion over it, committed acts of destruction upon it, and pursued a course of conduct having the effect to exclude the company altogether from the use of the reservoir, even for the purpose of supplying power to mills upon the lower rivers, whereupon the company brought a bill in equity against the owners at C, and, as they made no answer, the bill was taken *pro confesso*, and in December, 1867, there was a decree as follows: " It is ordered that each and every of the said defendants above named, their aiders, abettors, agents, servants, and employees, or of any or either of them, be strictly and perpetually enjoined and commanded forever hereafter not to enter upon the plaintiffs' said dam, situate in Wolfeborough in the county of Carroll, at the outlet of said Smith's and Crooked ponds, as described in said bill, and not to remove any of the plank, timber, stone, or other material thereof, or in any way injure said dam; and not to fill up, destroy, or otherwise injure the said channel of said plaintiffs between said Smith's and Crooked ponds; and not to open any of the gates in said dam, or close the same, or in any way interfere with or intermeddle with said gates, or any or either of them, without the consent of said plaintiffs first had and obtained."

Such, in outline, seem to be the material facts and circumstances of the case, so far as they are made to appear. While the record is somewhat extended, and the discussion has taken a wide range, there would seem to be nothing for this court to determine but the intent and meaning of the Goodwin deed, and the scope and effect of the decree of December, 1867. Around these the discussion has revolved, and upon these the rights of the parties mainly depend.

1. The defendant contends that the Goodwin deed conveyed no right whatever in the reservoir; that by its terms the reservoir, for any and all purposes, remained absolutely in the company. This contention is based primarily upon the words "the right to use the water-power and mill privilege on said premises." It is claimed that the words "on said premises" limited the operation of the grant to such water and power as might be available on the immediate premises, after such use of the reservoir above as the company might see fit to make of it for any purpose.

Such a construction would deprive the gristmill and sawmill, at dam C, not only of every vestige of right to a special source of power which appears to have been created for them, and upon which ever since 1780 they had been wholly dependent, but also of the ordinary rights incidental to riparian ownership.

If the consideration of the Goodwin deed had been nominal, or if an intention to put the property to some new use not requiring power supplied by the reservoir were apparent, it would be less difficult to accept the defendant's view in this respect. But the consideration was substantial, and it is evident from the terms of the deed and the subsequent conduct of the parties that the mills at C were bought and sold to be used as mills as theretofore.

It is so entirely improbable that the mills would be bought or could be sold for mill purposes and for a substantial consideration, without any right whatever to the power upon which they were "wholly dependent," that only the clearest language would justify a construction having such effect. The words upon which the defendant relies are insufficient for this purpose.

Apart from the extrinsic considerations suggested, taking the words in their immediate connection and natural sense, it seems more probable than otherwise that they were used to identify the privilege in connection with which the water right was being granted, rather than as words of limitation or exclusion affecting the measure of the right itself.

It is accordingly held that the grant of "the right to use the water-power and mill privilege on said premises" had reference to the water-power and mill privilege in their integrity, including,

subject to the right of the Lake Company as stated in the deed, the use of the reservoir upon which they were and for seventy-four years had been wholly dependent. Gould Wat., s. 307; Wash. Ease. 42, 44, 45, 326; 2 Wash. R. P. 302; *Perrin* v. *Garfield*, 37 Vt. 304, 312, 313; *New Ipswich Factory* v. *Batchelder*, 3 N. H. 190; *Gibson* v. *Brockway*, 8 N. H. 465; *Cocheco Mfg. Co.* v. *Whittier*, 10 N. H. 305; *Dunklee* v. *Railroad*, 24 N. H. 489, 495, 505; *Winchester* v. *Hees*, 35 N. H. 43; *Davis* v. *Handy*, 37 N. H. 65, 71; *Seavey* v. *Jones*, 43 N. H. 441; *Thompson* v. *Banks*, 43 N. H. 540; *Winnipiseogee etc. Co.* v. *Perley*, 46 N. H. 83, 102; *Riddle* v. *Littlefield*, 53 N. H. 503; *Spaulding* v. *Abbot*, 55 N. H. 423, 426; *White* v. *Hotel Co.*, 68 N. H. 38, 43; *Amoskeag Mfg. Co.* v. *Shirley*, 70 N. H. 577; *Whittenton Mfg. Co.* v. *Staples*, 164 Mass. 319, 326; *United States* v. *Appleton*, 1 Summ. 492.

But it does not follow from this construction that the deed conveyed to Goodwin exclusive right to the reservoir, subject only to the right therein specifically saved to the company. At the date of the deed the company was the owner of factory privilege B, situated between dams A and C. True, the referee finds that "from 1842 to 1894, when the defendant Hutchins erected his factory at dam B, that privilege had been unimproved and unemployed"; but he also finds that "previous to that period there was a dam and some kind of a mill at this point, and this was known as the factory privilege." In the bill in equity of 1866 it is alleged "that the mills and mill privileges on said Whitten's [Smith's] river are and for eighty years last past have been wholly dependent on the power created by said dam at the outlet of said Crooked pond to do business." In view of the plural form of the foregoing allegation, taken in connection with what appears to have been the fact — that C and B were the only privileges to which the allegation could refer, and with the finding of the referee that there was a dam and mill at the factory privilege prior to 1842, it would seem that the factory or B privilege made use of the reservoir concurrently with C from 1780 down to 1842, and, like C, was during such time "wholly dependent upon the reservoir to do business." The fact that Nathaniel Rogers, formerly one of the owners of the factory privilege, rebuilt the reservoir dam in or about 1830, and that, for a time at least, the owners of the mills at C were owners, in common with others, of the factory privilege, may or may not have significance in this connection. In any event, no abandonment of the factory privilege in 1842 or afterward is found. On the contrary, it was bought by the Lake Company as the "factory mill-privilege" in 1854 and 1857. That it was not extinguished or understood to be extinguished by the alterations and improvements made by the com-

pany in prosecution of the enterprise in behalf of the mills upon the lower rivers would seem to be indicated by the bill in equity of 1866, wherein the independent existence of the privilege and its continued dependence upon the reservoir are alleged by the company. In fact, the plaintiffs in argument seem to concede the present existence of the privilege, and to dispute only as to the measure of its rights.

If it were found that prior to the purchase of A, B, and C by the Lake Company, C had acquired by prescription exclusive right to the reservoir (*Perrin* v. *Garfield,* 37 Vt. 304, 309; *Brace* v. *Yale,* 10 Allen 441; *Hazard* v. *Robinson,* 3 Mason 272; *Bullen* v. *Runnels,* 2 N. H. 255; *Gilman* v. *Tilton,* 5 N. H. 231; *Odiorne* v. *Lyford,* 9 N. H. 502; *Winnipiseogee etc. Co.* v. *Young,* 40 N. H. 420; *Burnham* v. *Kempton,* 44 N. H. 78; *Eastman* v. *Company,* 47 N. H. 71, 77; *Bucklin* v. *Truell,* 54 N. H. 122), and that the Lake Company, during the unity of title and before severance of the estates by the Goodwin deed, had not by any positive act extinguished or modified the pre-existing relation, it might or might not be held that the exclusive right or easement thus acquired previous to the unity of title, although in the view of the law suspended during the common ownership, was revived again by their severance and passed to the grantee of the Goodwin deed by the general grant of the " mill privilege," subject only to the right specifically saved by the company. Gould Wat., *s.* 313; 2 Wash. R. P. 374; Wash. Ease. 644–653; 3 Kent 449; *Shury* v. *Piggot* (1626), 3 Buls. 339; *Hazard* v. *Robinson,* 3 Mason 272; *United States* v. *Appleton,* 1 Sumn. 492; *Dunklee* v. *Railroad,* 24 N. H. 489, 500; *Olcott* v. *Thompson,* 59 N. H. 154; *Grant* v. *Chase,* 17 Mass. 443, 448; *Cary* v. *Daniels,* 8 Met. 466, 480; *Ritger* v. *Parker,* 8 Cush. 145, 148; *Atlanta Mills* v. *Mason,* 120 Mass. 244, 250, 251. But no prescriptive right is found; and in view of the various elements necessary to establish such right in any case, the peculiar importance of clear evidence in the class of cases involving riparian rights (*Whitney* v. *Mills,* 151 Mass. 396, 403; *Tyler* v. *Wilkinson,* 4 Mason 397), and especially in view of the indications in the record, to some of which we have referred, that B may have used the reservoir concurrently with C down to 1842 in such manner as to prevent the acquisition of any prescriptive right by C, were it material, we cannot upon the facts before us find, and it is not our province to find, such prescriptive right.

As the case stands, whatever right in the reservoir passed to the grantees of the Goodwin deed by virtue of the grant of " the right to use the water-power and mill privilege " at C, passed not because such right belonged to privilege C by prescription (*Haz-*

*ard* v. *Robinson*, 3 Mason 272; *Voorhees* v. *Burchard*, 55 N. Y. 98, 105; 2 Wash. R. P. 303; 10 Am. and Eng. Enc. Law 418), but because it had been previously used in connection with and was reasonably necessary to the beneficial enjoyment of privilege C, and because " the law conclusively presumes it to have been the intention of the parties that the grantee should enjoy beneficially the subject of the grant." Wash. Ease. 31; 2 Wash. R. P. 302; *United States* v. *Appleton*, 1 Sumn. 492; *Hazard* v. *Robinson*, 3 Mason 272; *Dunklee* v. *Railroad*, 24 N. H. 489, 495, 505; *White* v. *Hotel Co.*, 68 N. H. 38, 43; and other cases already cited.

But while " property conveyed passes with all the incidents then rightfully belonging to it, or actually and usually enjoyed with it, . . . without any specification of them, and without the usual phrase, ' with all the privileges and appurtenances to the same belonging,' " such incidents pass by implication only " so far as they are necessary to the full benefit and perfect enjoyment of the property " expressly granted. *Dunklee* v. *Railroad*, 24 N. H. 489, 495. " There is no presumed grant of a right to exercise the easement in an unnecessary and unreasonable manner. The right of the easement owner and the right of the landowner are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both." *Olcott* v. *Thompson*, 59 N. H. 154, 156. " In determining what and how much shall pass as an incident appurtenant to that in terms conveyed by a grant of a mill site and appurtenances, it is the necessity of the mill for its full and free enjoyment which controls." *Voorhees* v. *Burchard*, 55 N. Y. 98; 3 Wash. R. P. 388. The actual use by the successive owners is not the measure of the necessity, but only evidence of it. *Voorhees* v. *Burchard*, *supra*; *Smith* v. *Blanpied*, 62 N. H. 652; *Olcott* v. *Thompson*, 59 N. H. 154, 156. " Whether any and what privileges pass by a grant of a thing, as well as the measure or limits of what is granted, often depends upon the circumstances and the condition of the property, and the language of the grant construed in the light of these circumstances. One general test is, how far the incidents claimed are necessary to the reasonable enjoyment of what is expressly granted." Wash. Ease. 49, 82, 83; *Morrison* v. *Marquardt*, 24 Ia. 35, 64; *James* v. *Jenkins*, 34 Md. 1, 11. " The grant of a mill, *eo nomine*, will carry the head of water by which it is driven, with the building, land, and privileges necessary to its use. But the privileges which pass by a grant, as well as the limits of the thing granted, will depend upon the circumstances and condition of the property at the time. The language of the deed is to be construed in the light of these circumstances.

The grant of a mill, which would ordinarily, by implication, give to the grantee an unrestricted right to the water-power connected with it, will be limited by the effect which this construction may have upon other interests and estates connected with the one granted. . . . The grant will not be extended by construction so as to destroy the other mills of the grantor, but will be held to give such rights in the water-power as are reasonably consistent with their future profitable use. . . . Under such a deed, it may be that the grant would be held to convey the water-power reasonably essential to the convenient use of the mill granted, and to reserve the power reasonably essential to the use of the mill retained, having reference to the then existing structures and their mode of using the water." *Hapgood* v. *Brown*, 102 Mass. 451, 453 ; *Crittenden* v. *Field*, 8 Gray 621 ; Wash. Ease. 56, 82, 83, 362, 363 ; 3 Wash. R. P. 388, 389.

The principle underlying the foregoing cases, to the soundness of which we fully assent, would apply unqualifiedly to the present case, if at the date of the deed in question there had been, as previously, a going mill at B, dependent upon the power created by the reservoir to do business. In the absence of any finding of previous abandonment, an intention on the part of the grantor to virtually and forever destroy privilege B by granting to privilege C, as against privilege B, the exclusive right to the power created by the reservoir upon which they were both dependent, will not be implied merely because privilege B was at the time dormant and unemployed. *Hatch* v. *Dwight*, 17 Mass. 289. But in the absence of any structures at B at the date of the deed, by which to measure and apportion the rights in the reservoir as between privileges B and C, the grant must be understood as conveying to privilege C the use of the reservoir so far as reasonably necessary to the beneficial enjoyment of that privilege.

The reasonably necessary use conveyed by the words of the grant in question was expressly restricted by the provision following, in behalf of mills upon the lower rivers, because otherwise the right of the grantor in that behalf would have been subject to such reasonably necessary use by the grantee. No express restriction was necessary to save to the grantor the use of the reservoir beyond such reasonably necessary use by the grantee, because nothing beyond such use was included in the grant, either expressly or by implication.

The conclusion is that the grant of " the right to use the water-power and mill privilege " at C conveyed, subject to the right specifically saved in behalf of the lower rivers, the use of the reservoir so far as reasonably necessary to the beneficial enjoyment of privilege C ; that the right to the use of the reservoir beyond

such reasonably necessary use by privilege C remained for any and all purposes in the grantors; and that in so far as the maintenance or management of the defendant's dam at B interferes with the reasonably necessary use of the reservoir by C, it is unlawful and should be restrained and regulated in accordance with the relative rights of privileges C and B as already defined.

2.    But the defendant contends that if the words of the grant, considered by themselves, are broad enough to convey rights in the reservoir, the words following so curtailed the grant as to exclude from its operation all right in the reservoir.    This contention is based upon the following words in the deed: "The said company having the right to detain and hold back or to discharge the water of said ponds at such times as they may think proper for · the advantageous use of said reservoir."    Taken by themselves, these words would give some support to the defendant's contention; but considered in connection with the words immediately preceding them, i. e., "the·right to use the water-power and mill privilege on said premises at such times as said company shall not consider the same as interfering with the use of Smith's pond above said premises as reservoirs for the supply of water for mills anywhere upon the Winnipiseogee and Merrimack rivers, which right and use said company do fully reserve and do not convey," it becomes quite evident that the words "the right to detain . . . as they may think proper . . . for the advantageous use of said reservoir" all had reference to the use of the reservoir for the purpose which had been just before specifically mentioned, i. e., "for the supply of water for mills anywhere upon the Winnipiseogee and Merrimack rivers."

3.    But the defendant contends, further, that whatever construction might be placed upon the Goodwin deed as an original question, the rights of all parties holding title under it were adjudicated by the bill in equity and decree of December, 1867, and that it was then conclusively determined that the exclusive use of the water, as well as the control of the dams, gates, and structures of the reservoir, belonged to the company.    The referee has found, so far as it is a question of fact, that the decree was "an agreement by the then defendants, the ancestors in title of these plaintiffs, as to the control and protection of the structures and apparatus of the company, at the outlet of the reservoir, confirmed by decree of court."

This conclusion involves a finding, so far as the question is one of fact, that the decree did not determine anything as to the relative rights of the parties to the water supplied by the reservoir. The findings of the referee elsewhere, recognizing, in effect, the existence of rights in the owners of C to the waters of the reser-

voir, subsequent to the decree, are, in line with this general conclusion. An examination of the bill in the light of the preceding and subsequent conduct of the parties, and all the surrounding facts and circumstances of the case, makes it quite clear that the referee correctly apprehended the true meaning and effect of the decree, and that his conclusion in this respect is as well founded in law as in fact. It follows that the water rights of the parties, differentiated from the management and control of the structures by which those rights were secured and regulated, were not affected by the decree, but were and still are governed by the Goodwin deed as absolutely as if no such decree had been made.

4. Finally, it is claimed by the defendant that whatever right he may or may not have to the reservoir as against privilege C, in behalf of privilege B or any other privilege owned by him on Smith's river, he has absolute right to the reservoir as against privilege C, in behalf of mills upon the Winnipiseogee and Merrimack rivers, by virtue of the deed of the company to Brewster and Martin and the deed of Brewster and Martin to himself, which he contends vested in him the rights reserved to the company in that behalf by the Goodwin deed. The plaintiffs claim, on the other hand, that the right reserved to the company, to use the reservoir in behalf of mills on the Winnipiseogee and Merrimack rivers, was not conveyed to Brewster and Martin, and therefore never passed to the defendant. In view of the finding of the referee, that the defendant has no interest in or contract with mills on those rivers, and has made and is making no use of the reservoir for their benefit, but is managing it solely in the interests of his mills on Smith's river, the question presented in this connection would seem to be abstract rather than practical; and inasmuch as no injury is claimed by either party on account of the use, or interference with the use, of the reservoir for the purpose named, the judgment of the court upon this question would appear to be uncalled for.

This would seem to dispose of the questions of law presented by the record. The superior court will grant such further hearings and make such orders and decrees as may seem necessary to a final determination of the rights of the parties, in conformity with the views herein expressed.

*Case discharged.*

All concurred.