## BLUE CIRCLE ATLANTIC, INC. *v.* TIMOTHY F. BANNON, COMMISSIONER OF REVENUE SERVICES

SUPERIOR COURT                    FILE No. 356244
TAX SESSION

Memorandum filed November 10, 1993

*Day, Berry & Howard,* for the plaintiff.

*Richard Greenberg,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendant.

BLUE, J. This case involves the interpretation of a sentence contained in General Statutes § 12-219a, which apportions the tax base of certain corporations doing business within and without the state. Section 12-219a provides that "the intangible assets of a company having its principal place of business within the state shall be deemed to have a tax situs within the state unless it can be clearly established that some or all of such assets are held in connection with business conducted during the income year without the state . . . ."

Blue Circle Atlantic, Inc., was known as Atlantic Cement Company (Atlantic) during the taxable years in question, 1982–84. Atlantic was (and is) in the busi-

ness of manufacturing and selling cement. Its principal place of business was concededly in Connecticut, but both of its manufacturing plants were located outside of the state, and ten of its eleven terminals were located outside of the state. The question here concerns the tax situs of the accounts receivable generated by the ten out-of-state terminals. To understand this problem, a brief description of Atlantic's business is necessary.

Atlantic manufactured its cement in New York and Maryland. The cement was then delivered by water to its various terminals, where the actual cement sales were made. Virtually all of Atlantic's sales were to repeat customers who were primarily ready-mix companies. Its rate of account delinquency was very low, perhaps three or four percent. Each customer would have a line of credit established by the principal office in Connecticut after appropriate investigation and consultation with the local personnel. After a line of credit was established, a customer could obtain cement either by calling in an order to the local terminal or by simply sending a truck to that terminal to be filled. Later, the terminal would send the customer a weekly bill. The bill was payable by a check sent to a Connecticut bank that would deposit the check into Atlantic's account.

The accounts receivable were doubtless "held" in Connecticut, but were they "held in connection with business conducted . . . without the state"? Atlantic contends that, except in the case of sales generated by its Connecticut terminal, they were, and it has prepared its returns accordingly. The commissioner of revenue services (commissioner) disagrees and maintains that *all* of the accounts receivable have a tax situs in Connecticut.

The resolution of this case turns on statutory construction rather than constitutional power. It may well be, as the commissioner contends, that under *Wheel-*

*ing Steel Corp.* v. *Fox,* 298 U.S. 193, 56 S. Ct. 773, 80 L. Ed. 1143 (1936), Connecticut could declare itself the tax situs of all the receivables in question and tax them accordingly. Connecticut has not, however, done so. Rather, it has enacted a statute that plainly taxes less than the limits of constitutional power would theoretically allow. Under § 12-219a, the tax situs of the intangible assets in question is presumptively in Connecticut, but this presumption is rebutted if it is "clearly established that some or all of such assets are held in connection with business conducted during the income year without the state."

As an evidentiary matter, Atlantic has clearly established that the receivables in question were generated by business conducted without the state of Connecticut. As a practical matter, the facts set forth above are not even controverted by the commissioner. The case consequently turns on statutory construction. Were these assets "held in connection with business conducted . . . without the state"? The answer is plainly in the affirmative.

The commissioner takes an exceedingly narrow view of the words "held in connection with." In his view, these words require the assets in question to themselves "become an integral part of the local business activities" conducted outside the state. This view would be persuasive if the legislature had written the statute to exempt assets that are "an integral part of business conducted . . . without the state." The legislature did not, however, write such a statute. Alternatively, the legislature could have restricted the exemption to assets "held for use in business conducted . . . without the state." Again, it did not, Or, again alternatively, the legislature could have simply restricted the exemption to assets "held without the state." Once again, it did not. Doubtless other formulations that would have

adopted the commissioner's position or something like it can be imagined. None of these, however, was used.

Instead of these possible formulations, the legislature chose the words "held in connection with." Simply as a matter of the English language, these words imply that if the assets in question have some real, cognizable connection with business conducted without the state and if it is clearly established that this connection exists, those assets cannot be deemed to have a tax situs within the state.

I do not, however, need to rely solely on my own sense of the English language, for I do not write on a clean slate. The words "in connection with" have been used in a variety of statutory and contractual contexts, and they are invariably given a broad construction by the courts. Section 10 (b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j [b]), for example, forbids the use of manipulative or deceptive devices "in connection with" the purchase or sale of securities. The Second Circuit held that this phrase should be "broadly construed" in the landmark case of *SEC* v. *Texas Gulf Sulphur Co.,* 401 F.2d 833, 861 (2d Cir. 1968), cert. denied sub nom. *Coates* v. *SEC,* 394 U.S. 976, 89 S. Ct. 1454, 22 L. Ed. 2d 756 (1969), and subsequent federal courts have consistently done so. "The plaintiff in a Rule 10b-5 case need not establish a direct or close relationship between the fraudulent transaction and the purchase or sale, but only that the transaction involving the sale 'touch' the transaction involving the defendant's fraud." *Alley* v. *Miramon,* 614 F.2d 1372, 1378n, (5th Cir. 1980); see *Superintendent of Insurance* v. *Banker's Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971).

There are, of course, special reasons to construe the securities laws broadly to effectuate their remedial purpose. But the phrase "in connection with" is also con-

strued broadly by the courts when it is used in private contracts. See *Jackson* v. *Lajaunie,* 264 La. 181, 270 So.2d 859, 864 (1972); *Horne* v. *Hutchins,* 71 N.H. 117, 134, 51 A. 651 (1901); *Dirk* v. *Amerco Marketing Co.,* 88 Wash.2d 607, 611, 565 P.2d 90 (1977). Perhaps more to the point, when the phrase was used in the now repealed federal cabaret tax statute (formerly 26 U.S.C. § 1700 [e] [1]) (which defined a "cabaret" as a place where refreshments were sold "in connection with" dancing privileges), the federal courts consistently held that "the phrase . . . conveys its meaning plainly and does not connote that those things connected are in the relationship of primary and subsidiary." *Birmingham* v. *Geer,* 185 F.2d 82, 85 (8th Cir. 1950), cert. denied, 340 U.S. 951, 71 S. Ct. 571, 95 L. Ed. 686 (1951); accord *Avalon Amusement Corp.* v. *United States,* 165 F.2d 653, 654 (7th Cir. 1948).

Consequently, even though the "in connection with" language in § 12-219a occurs in the context of a tax exemption and, therefore, must be narrowly construed against the taxpayer, its meaning is plain enough. Atlantic has clearly established that the receivables in question were held in connection with business conducted during the income year without the state. Its appeal must, therefore, be sustained.