### ESSEX COMPANY *vs.* CITY OF LAWRENCE.

Essex.   January 21, 1913. — February 26, 1913.

Present: RUGG, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Tax*, Abatement, Assessment.   *Practice, Civil*, Petition for abatement of tax.
Superior Court.   Water Rights.

R. L. c. 14, § 42, so far as it relates to proceedings for the abatement of a tax assessed upon the property of a canal corporation, is not repealed by § 95 of St. 1903, c. 437, section one of which expressly excludes canal corporations from its operation.

The right of a corporation to appeal under R. L. c. 14, § 42; c. 12, § 77, from a refusal by the assessors of the city or town where its real estate and machinery are situated to grant an abatement of a tax for which it had applied after being notified by the tax commissioner that his valuation of its real estate and machinery was less than that of such assessors, is a right which exists even though the corporation has not filed with the assessors the list of its property which is required by R. L. c. 12, § 41.

Where the assessors of a town or city in which the real estate and machinery of a corporation are situated refuse to grant an application for an abatement of a tax which the corporation has made under R. L. c. 14, § 42, after the tax commissioner had notified it that his valuation of its real estate and machinery was less than that of the assessors, the corporation becomes a " person

aggrieved" by such refusal, and may prosecute an appeal, not only by a complaint to the board of county commissioners under c. 12, § 77, but also by a complaint to the Superior Court under § 78.

A commissioner, appointed under R. L. c. 12, § 80, to hear and report upon a complaint filed on an appeal from a refusal by assessors to abate a tax, used language in his report from which it was not certain that he applied the true rule for the ascertainment of the value of the property in question for purposes of taxation. At the conclusion of his report he stated what he found to be the property's "fair cash value for taxation." No exception was taken or ruling made upon such findings. A judge of the Superior Court, after a hearing, reported the case to this court for determination, the parties agreeing that the findings of fact by the commissioner were to be taken as an agreed statement. *Held*, that the valuation found by the commissioner as "the fair cash value for taxation" must be treated as final.

A water power corporation owning land by a river in a city constructed a dam and canals for the purpose of turning the waters of the river upon the wheels of many mills situated upon or near its canals, and then conveyed to various persons different mill sites together with a grant to each of a definite easement of flowage of water with a given fall, reserving to itself in such conveyance a certain "rent" in perpetuity. Many years after such conveyances, the assessors of taxes of the city, in assessing to their several owners the sites to which such mill powers had been made appurtenant, increased the valuations and added such increase both to the amounts of the assessments upon the owners of the mill sites and to the amount of the assessment upon the water power corporation. The corporation appealed from a refusal of the assessors to abate the tax assessed upon it. *Held*, that so far as the water power developed by the structures of the corporation had been assessed by increasing the valuations of the several mill sites, to the same extent the assessors' valuation of the corporation's land and structures should be diminished.

PETITION, filed in the Superior Court on January 1, 1910, in the nature of a complaint under R. L. c. 12, § 78, on an appeal from a refusal of the assessors of taxes of the respondent to abate a tax assessed upon the petitioner for the year 1909.

The case was referred to James F. Jackson, Esquire, as a commissioner under R. L. c. 12, § 80. The material portions of the commissioner's report were as follows:

The Essex Company was incorporated under St. 1845, c. 163. In the exercise of its chartered rights the company constructed a dam across the Merrimack River at Lawrence with two canals, that on one side of the river called the North Canal, and that on the other the South Canal.

The activities of the Essex Company in developing its water power plant and incidental real estate holdings were undoubtedly the potent factor in giving to Lawrence its importance as an industrial community.

In 1909 the local assessors, abandoning the form of assessment previously used, assessed the real estate and machinery of this corporation at a valuation very largely in excess of the valuation of previous years.

The petitioner waived its petition for abatement except as to the following items:

Dam and wing walls . . . . . . . . . . . . . $435,000
North Canal and land under same . . . . . . . 360,000
South Canal and land under same, including iron
    penstock leading from easterly end of canal to
    easterly line of Union Street . . . . . . . . . 225,000

The items of property above named embrace the entire water power plant of this corporation, except the land under the dam and wing walls, not assessed. No question is raised as to the form of assessment.

In May, 1909, the petitioner had long since sold to companies operating manufacturing plants along or near its canals all of what is known as its permanent water power, conveying it under the name of mill powers. The deeds from the petitioner to the respective purchasers contained an habendum clause conveying the mill site and the mill power to the purchaser "to have and to hold" to him "and his assigns to their own use and behoof forever," with the provision as to annual payments described below. There were one hundred forty-two and one twelfth of these mill powers, each being defined as "the right to draw twenty-five cubic feet a second when the fall is thirty feet." In assessing to their several owners the sites to which these mill powers had been made appurtenant the assessors in 1909 had enhanced their valuation of the land to the extent of $4,000 for each mill power. In the aggregate these sites thus were enhanced in value by the amount of $568,333 on account of appropriated water power.

The consideration named in these deeds was wholly or in part a perpetual annual payment, the paragraph relating thereto reading as follows: "In order to continue in the grantors an interest in common with the grantees for the preservation and support of the mill powers which may be granted and to secure a fund to indemnify the grantees for expenses which may be in-

curred by them for making repairs if the grantors should improperly neglect to make them; it is proposed that part of the consideration of every sale, and all that is to be allowed the grantors for the repairs, etc., by them assumed, should be paid or secured to them in the form of a reservation of rent. It is therefore declared that each mill power with the land to which it is annexed shall forever be subject to a perpetual annual rent of at least two hundred and sixty ounces troy weight of silver of the present standard fineness of the silver coin of the United States, or an equivalent in gold, at the option of the grantee at the time of payment; which rent is to be paid in yearly payments forever, free from all charges or deduction whatever for taxes or assessments of every description which may be assessed or levied upon any granted premises after the making of the deed, all of which are assumed by the grantees; and a perpetual annual rent, at least equal to the above shall be reserved for every mill power hereafter sold; and no rent shall be reduced or extinguished by the grantors but by consent of all the grantees."

Under another written agreement between the parties, the company had agreed to sell at a stipulated price under certain conditions to the owners of the permanent mill powers their proportionate parts of what is known as its surplus water power.

"No accurate evidence of the original cost of the dam, canals and appurtenant structures was offered, but it is safe to say that independent of expenditures for land it considerably exceeded $650,000. The dam and walls being of stone the plant suffers little if any depreciation.

"I find upon expert testimony that the cost of replacing the dam, wing walls, and canals, in May, 1909, using stone as in the existing structures, would have been $757,094. Using concrete, which was then an equally durable and efficient substitute for stone and to some extent probably more desirable in permitting the flow of water with less friction, the cost would have been $688,268.

"I find upon expert testimony that of this amount the cost of that part of these structures which was built and has been maintained exclusively for purposes of navigation would have been $94,000 using stone, and $86,000 using concrete."

"There was no evidence to show the price paid for the land occupied by this plant, but this land is devoted like other adjacent lands to a commercial use. Taking into consideration that use, presently and prospectively profitable, and weighing the testimony as to sales of adjoining lands, I find that the land under the North' Canal on the first day of May, 1909, had a fair cash value of $189,443 and that the land under the South Canal then had a fair cash value of $45,600.

"I therefore find that upon the basis of replacement values the items of real estate and machinery under consideration, exclusive of the property wholly devoted to navigation, had on the first day of May, 1909, a fair cash value of $898,000.

"The dam, canals, land and incidental structures make up commercially a unit of property. No one of them apart from the others has any considerable market value, but taken as contributing parts of a productive whole they make up a property that would readily attract capital. The physical features of the plant are of a lasting character. The flow of the river though varying more or less in different seasons furnishes a reliable water supply that can be safely estimated and that is converted by a simple instrumentality into a product which has an assured market value.

"The gross annual revenue of the company from the sale of its surplus water power and a negligible quantity of water for other uses has averaged for a series of eight years ending with 1909 approximately $69,000. The gross annual revenue from permanent mill powers for the same period has been approximately $54,000. The total gross revenue of the company annually would be safely estimated at $123,000.

"The expenses fairly chargeable to the water plant can be distinguished from expenses chargeable to the other business of the company. From an examination of figures covering the eight years ending with 1909, I find that leaving taxes out of consideration the company has realized a net income annually from its water power plant of at least $72,000. Using as a factor a reasonable percentage of return upon capital I find that under the conditions described on the first day of May, 1909, this water plant upon the basis of its productive power had a market value approximately $1,000,000, practically the amount of the replace-

ment values of all of its several parts as they were and in the uses to which they were devoted.

"The surplus water power of the petitioner can be used most advantageously in connection with the mill sites to which the permanent mill powers have been annexed and this surplus water customarily is, and upon May 1, 1909, was so used."

"I find that the dam, wing walls, canals and land under consideration have no substantial value for any other use than that of producing water power and that their entire capacity is practically exhausted in producing the permanent mill powers and the surplus water power which have been described.

"I further find that the tax assessed at the several mill sites in the enhancement of these several parcels of land in the aggregate by $568,333 is not a tax upon the whole productive capacity of the land and structures by which the water power is created.

"I further find that omitting from consideration property exclusively devoted to public uses of navigation and making due allowance for the assessment of $568,333 on account of water power at mill sites, the real estate and machinery of the petitioner described in the items under consideration had on the first day of May, 1909, a fair cash value for taxation of $329,667 which I apportion among those items as follows:

| | |
|---|---:|
| "Dam and wing walls . . . . . . . . . . . . . | $92,307 |
| "North Canal and land under same . . . . . | 158,240 |
| "South Canal and land under same, including penstock leading from the easterly end of the canal to the easterly line of Union Street . . . . . | 79,120 |
| | $329,667 |

"I therefore find that the petitioner was assessed and has paid a tax for the year 1909 upon valuations which were in the aggregate $690,333 more than the fair cash value of the property on which said tax was assessed."

The case was heard by *Quinn*, J., upon the commissioner's report. The respondent asked for the following rulings:

"1. Upon the completion of the dam and canals two classes of value were created. One was a value that attached to the strips of land lying between the canals and the river as mill sites

by reason of their proximity to the canals. The values of these various mill sites was more or less according to the extent of the privilege to use power, as indicated by the number of mill powers, but this value was merged in the price of the land. The other is a value that sprang from the operation of the canal as a business in supplying water power for which a perpetual rent was reserved in the indentures and this value is inherent in the dam and canals as the property of the Essex Company. Both are land values. The first value is assessed to the various mills. The second value is legitimately assessed to the Essex Company.

"2. The evidence in the case is insufficient to warrant a revision of the assessment.

"3. The question in this case is not affected by the valuation put by the assessors on water power as an enhancement of the value of the land of the mills. Whether that is too high or too low or what revenue it would afford if received as income on the cost of construction of dam and canals is of no consequence. It is entirely distinct from the productive value that is in the dam and canals as a part of the water power business of the petitioner.

"4. Upon the evidence no water power has been sold to the mills but merely a right to have water power furnished in return for future payments by way of rent for both permanent and surplus power.

"5. The fact that the method of disposal of its permanent water power, so called, by the petitioner under its indentures is described therein as a sale is of no consequence, since the terms of the indentures show that it was not a sale but an agreement in the nature of a lease of or license to use water power, for which a perpetual rent was reserved. As to surplus water power, the method of disposal shown in the regulations for the use of surplus water power is not described therein as a sale and the terms thereof show that it was not a sale but an agreement for the use of surplus water power. The methods for the disposal of permanent water power, so called, and of surplus water power are essentially the same, and, as matter of law, no distinction can be made between them.

"6. Upon the facts found by the commissioner the fair cash value of the property of the petitioner for purposes of taxation is $898,000."

The respondent also moved that the petition be dismissed on the ground that the Superior Court had no jurisdiction of it.

The judge refused to make any of these rulings, and denied the motion to dismiss. He reported the case for determination by this court.

Other facts are stated in the opinion.

*F. E. Dunbar, (J. J. Rogers & A. C. Spalding* with him,) for the petitioner.

*J. P. Sweeney, (D. J. Murphy* with him,) for the respondent.

RUGG, C. J. This is a complaint filed in the Superior Court under R. L. c. 12, § 78, in the nature of an appeal from a refusal by the assessors of Lawrence to abate taxes assessed to the Essex Company for 1909.

It is urged that the Superior Court has no jurisdiction to entertain the complaint. The reason put forward in support of this contention is that, the petitioner having filed no list as required by R. L. c. 12, § 41, and hence not being entitled as of right to petition for abatement under § 74, it can proceed only under R. L. c. 14, § 42, which refers to R. L. c. 12, § 77 alone, and therefore limits the right of appeal to the county commissioners.

The assessors of Lawrence in 1909 greatly increased the valuation of the real estate of the petitioner, and the tax commissioner of the Commonwealth found the value thereof, for the purpose of estimating the petitioner's excise tax, to be less than that fixed by the assessors. Thereupon he sent to the petitioner a letter, in which he said: "You are hereby notified in accordance with the provisions of Section 42 of Chapter 14 of the Revised Laws, that the value of the real estate and machinery of the Essex Company situated in the city of Lawrence, as determined by the tax commissioner, is $1,431,750, being less than its value as determined by the assessors of Lawrence, by $545,000, the assessors having valued the same at $1,976,750. Your attention is respectfully directed to the provisions contained in the same section; by which if said corporation does not, within one month from the date of this notice, make application to said assessors for an abatement, and does not, in case of the refusal of said assessors to grant an abatement, forthwith prosecute an appeal, in accordance with the provisions of chapter 12, Sections 77 or 78 of the Revised Laws, and give notice thereof to the tax commis-

sioner, such determination will be conclusive upon said corporation for the purposes of the above act."

It has been faintly argued that R. L. c. 14, § 42, was repealed by St. 1903, c. 437, § 95. But this is not so, for the reason among others that c. 437, according to § 1, does not apply to a canal corporation, which the petitioner is in some aspects of its charter duties.

The jurisdictional contention of the respondent cannot be sustained. The tax commissioner is required by R. L. c. 14, § 42, to notify the corporation in case he finds the value of its real estate and machinery subject to local taxation to be less than that made by the local assessors. This is doubtless in order that it may save itself from a result in some respects similar to double taxation, by applying for an abatement first to the assessors, and then by appeal under R. L. c. 12, § 77. The original enactment was St. 1865, c. 283, § 6, which since has been a part of our corporation tax law. It applies only when the tax commissioner does not accept the valuation of the local assessors in reliance upon the last clause of R. L. c. 14, § 38, but makes an independent valuation. That is the case at bar. It offers an opportunity to the corporation, but does not force upon it a course of action. The corporation is enabled to get its real estate and machinery valued by an appellate tribunal, not because it has put itself in a position by having filed a list where it can enforce a right, but because a different officer representing another branch of the general taxing power of the Commonwealth has affected its interests by making a new valuation. The right of the corporation to apply for abatement under such circumstances exists even though it has filed no list. *Lowell* v. *County Commissioners*, 146 Mass. 403, 410.

Refusal on the part of the assessors to make a reduction of valuation constitutes the corporation "a person aggrieved" within the meaning of those words in R. L. c. 12, § 77. *Hough* v. *North Adams*, 196 Mass. 290. Every "person aggrieved" within the meaning of § 77 is given by § 78 the alternative of appealing to the Superior Court instead of to the county commissioners. It is of no consequence in this connection how the grievance arises. It comes through failure of the assessors to grant an abatement, which the taxpayer was either entitled to ask for by reason of having seasonably filed a list, or permitted by the statute to ask

for by reason of the action of another representative of the taxing power. The procedure is the same in either case. There appears to be no inconsistency between R. L. c. 14, § 42, as thus.interpreted, and § 39 of the same chapter, which authorizes the tax commissioner to require a corporation to prosecute an appeal from the valuation of its real estate and machinery either to the county commissioners or to the Superior Court. The substance of this section appears first in St. 1890, c. 127, § 7, by which jurisdiction in tax appeals was earliest conferred upon the Superior Court. It was not necessary to enact a special section to include corporations. They were comprehended under the word "person" in § 1 of that act. Pub. Sts. c. 3, § 3, cl. 16 (R. L. c. 8, § 5, cl. 16). Section 39 confers upon the tax commissioner power to require a corporation, which is in a position to do so, to prosecute an appeal from the valuation of the assessors, a power not conferred by § 42 or its earlier enactments, and it does not make the exercise of such power dependent upon a determination of value by the tax commissioner less than that of the local assessors. It is not necessary to point out further differences nor to determine the scope of § 39. It follows that these two sections do not cover the same ground, and that the Superior Court has jurisdiction of this petition.

The case was tried before a commissioner appointed under R. L. c. 12, § 80, whose findings of fact by agreement now are to be taken as an agreed statement. It comes here on a report by a Superior Court judge upon his refusal to give certain rulings.

The salient facts are that the petitioner owns certain lands in the city of Lawrence, upon which have been erected a dam and canals with other appliances for turning the waters of the Merrimack River upon the wheels of divers mills situated upon or near its canals. It also is required by its charter to make provision for the navigation of the river, and is given the right to collect tolls, but this aspect of its corporate rights and duties is not material to the issues here raised. These constructions are capable of producing, in conjunction with the flow of the river and its fall, a large amount of power. Long before 1909, the petitioner had conveyed to companies operating manufacturing plants along or near its canals land (which was to be perpetually devoted to mill purposes, according to the terms of the deed or indenture of conveyance) together with all of what is called its

permanent water power under the name "mill powers," each mill power being defined as "the right to draw twenty-five cubic feet a second where the fall is thirty feet." These conveyances, so far as concerned water power, were in the form of indentures in conveyances of land which reserved in perpetuity to the Essex Company an annual rent for each mill power with the land to which it is annexed of "two hundred and sixty ounces troy weight of silver" with other provisions not here of consequence. The situation disclosed is that the Essex Company, owning land in connection with which it as riparian proprietor had made a large water power development, sold subdivisions of the land, to each of which it annexed a definite easement of flowage of water with a given fall. The assessors of Lawrence in 1909 made a valuation of the mill sites merely as land, and then enhanced this valuation by $4,000, for each mill power appurtenant to the land, the aggregate of values thus assessed being $568,333. The Essex Company had developed, in addition to the so called "permanent water power," a considerable surplus water power, which was disposed of to the several mill owners under a different form of agreement, not perpetual in terms, and terminable by either party. The commissioner found "that upon the basis of replacement values the items of real estate and machinery" of the Essex Company, "exclusive of the property wholly devoted to navigation, had on the first of May, 1909, a fair cash value of $898,000" (which seems to have been used in subsequent computations), and that "this water plant upon the basis of its productive power had a market value approximately $1,000,000." It is not certain, from this language, that the true rule was followed by the commissioner. Original cost with deductions, if any, for depreciation, replacement cost and productive power are all legitimate elements bearing upon true value, but no one of them is decisive. The standard established by the law is fair cash value, having reference to any and all uses to which the property is reasonably adapted. *Blackstone Manuf. Co.* v. *Blackstone,* 200 Mass. 82, 89. *Farmington River Water Power Co.* v. *County Commissioners,* 112 Mass. 206, 217. *Smith* v. *Commonwealth,* 210 Mass. 259, 261, and cases there cited. But as the conclusion of the report is a statement of "the fair cash value for taxation" and as no exception was taken or ruling made upon this point, the finding in this

respect must be treated as final.  The argument in behalf of the city, to the effect that property is escaping taxation under the rule adopted, would have been pertinent upon the question of fact as to the fair cash value of the real estate and machinery. That question is not before us, but was settled by the commissioner.

Water power has been held to be "a capacity of land for a certain mode of improvement, which cannot be taxed independently of the land.  *Boston Manuf. Co.* v. *Newton*, 22 Pick. 22." *Lowell* v. *County Commissioners*, 152 Mass. 372, 383.  Land upon the bank of a river and in its bed where there is a fall and adjacent land adapted for flowagé may have a largely increased worth in the market by reason of these characteristics, which may be made available for valuable use in different ways.

The Essex Company as the owner of the entire water power development with contiguous land had a right to carve its property by selling fractional parts as sites for mills with power rights appurtenant and by retaining other parts upon which are located the dam and canals, and to assume by contract with the purchasers of the sites the burden of maintaining the dams and other structures, by which the capacity for power of the river water might be made available in perpetuity.  As all the real estate constituting the original property unit of the Essex Company, including that now owned by its grantees, lies in a single municipality, no conflict of jurisdiction arises.  See *Pingree* v. *County Commissioners*, 102 Mass. 76; *Blackstone Manuf. Co.* v. *Blackstone*, 211 Mass. 14.  The rights of the Essex Company and the owners of the mill sites as to each other need not be analyzed. When the mill powers became by use and by conveyance or contract parcel of the several mill sites, they were properly taxable with them, not as distinct and independent items of property, but as increasing the value of the land.  *Flax Pond Water Co.* v. *Lynn*, 147 Mass. 31.  If the Essex Company had retained ownership of its original real estate unit, its value would have comprehended the land, its capacity for utilizing the force of the river for power and the structures by which this capacity had been developed.  Assuming that this was the most valuable use to which the land could be put, these elements in combination would have made up the entire value of the land.  Since it has divided its real estate unit by selling some of its land and incorporating

therewith a part of the capacity of the river to produce power, the land value of that which is left must be diminished. If it has acquired as a part of these sales valuable rights to rent, these do not constitute real estate. The capacity of its land for improvement by dams and canals to utilize the fall of the river for power was single; whatever part of it is treated as annexed to the mill sites must be subtracted. In reaching this result, the enhancement of value of the land occupied by the several mills by reason of the mill powers in use annexed to them must be considered. The land upon and near the river and canals without doubt was affected in value by reason of its location, so that upon water wheels installed thereon water might be turned from the canals. But the absolute and perpetual right to have a definite quantity of water turned upon such wheels was a different and additional element of value. The value of the land of the Essex Company with dam and canals upon it having a capacity in conjunction with the river and its fall of developing one hundred and forty-two and one-twelfth permanent mill powers would be much greater in reason if the right to the use of these mill powers had been not annexed in perpetuity to other parcels of real estate. The valuable uses to which the land of the Essex Company could be put, including that of developing the capacity of the river for power, should be considered in estimating its fair cash value. The commissioner appears to have done this, for he reports that he has considered the "presently and prospectively profitable" commercial uses of the land.

It follows that so far as the capacity of the water of the river to produce power developed by the structures of the Essex Company has been assessed by enhancement of the several mill sites, to the same extent its land and structures should be diminished in the valuation for taxation which otherwise would be placed upon them.

All the requests for rulings by the city of Lawrence were refused rightly. The case is governed by *Lowell* v. *County Commissioners,* 6 Allen, 131, which the commissioner seems to have followed upon this point.

> *Abatement granted with interest and costs. Judgment to be entered for the petitioner in accordance with the finding and the report of the commissioner.*